**REICHELLAW PC**
**MARK REICHEL, State Bar #155034**
455 Capitol Mall, Suite 802
Sacramento, CA 95814
Telephone: 916.548.7398
Facsimile: 888.505.9331
Email: mark@reichellaw.com
www.reichellaw.com

Attorney for Defendant
KHURSHEED HAIDER

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-00299 DC |
| Plaintiff, | DEFENSE SENTENCING MEMORANDUM |
| vs. | NO FORMAL OBJECTIONS |
| | Date: December 19, 2025 |
| KHURSHEED HAIDER, | Time: 9:00 N/A |
| Defendant | HON. DENA M. COGGINS, UNITED STATES DISTRICT JUDGE |

## NO FORMAL OBJECTIONS TO THE PRESENTENCE REPORT

Defendant, through counsel, has no formal objections to the Presentnece Investigation and Report on file.

# SENTENCING MEMORANDUM

The defendant urges this Honorable Court to sentence him to a statutory minimum of 60 months, five years.

**<u>Legal Argument</u>**. As is widely known, virtually anything at all, post *Booker*, is a valid issue for the court to consider when imposing a sentence. The Sentencing Reform Act, 18 U.S.C. §3551 et seq., imposes an "overarching instruction" that district courts must select a sentence ***"sufficient but not greater than necessary"*** to achieve the sentencing goals in section 3553(a)(2). *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). The factors set forth in 3553 comprise "a tapestry of factors, through which runs an overarching principle," the court's duty "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

Section 3553(a)(1) begins with the "broad command" to consider the nature and circumstances of the offense and the history and characteristics of the defendant. The statute also requires judges to consider the types of sentences available by statute, section 3553(a)(3), including "sentences other than imprisonment," such as probation. The Supreme Court envisions that a district court will always consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect Section 3553(a) considerations, reflects an unsound judgment, does not treat defendant

characteristics in the proper way, or that a different sentence is appropriate regardless. Along with this, the Court places nothing off-limits for district courts. All the Guidelines are advisory and a judge may determine that any within Guidelines sentence is "greater than necessary" to serve the objectives of sentencing. *Kimbrough*, at 564. District courts may not simply defer to policies of the Commission.

It is against this instruction that the factors in 18 U.S.C. 3553 are to be examined in the present case—for markers to discover whether the Guideline Range "does not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless." *Rita v. United States*, 551 U.S. 338, 342 (2007).

A short summary of the unique factors of the case compels the Court to sentence Dr. Haider to the minimum sentence. The Court is urged to read the attached letters for a deeper understanding of Dr. Haider as told by those who know him the very best. As well, the report of Dr. Matthew Soulier, and the polygraph result of Dr. Haider from Mr. Lierly are essential to an understanding of the factors in the sentencing discussion.[1]

Starting at the beginning, Dr. Haider's ecosystem, the ecosystem that he was raised in, consisted of the following extreme adverse childhood experiences. He was sexually abused and had no outlet for expressing his shame, grief, damage and humiliation. It

---

[1] The polygraph was performed to establish that Dr. Haider has never in his life inappropriately or sexually engaged with or touched a minor. At this initial hearing on detention, the Government counsel suggested that such conduct was highly likely based upon the nature of the offense. This has been an issue the defense wants to establish conclusively for the Court for more than that reason, as it also goes to his character and his lack of any danger to the public.

happened again.  He was exposed to pornography at a very early age; he was bullied and mistreated and emotionally abused. Those experiences are then to be contrasted to the wonderful and healthy adult relationships he maintained throughout his adult life.

Moving forward, we look at Dr. Haider's tremendous work in helping others, and his extensive efforts to build and maintain a great family.  The consequent factor in that area is that he has great responsibilities for his family, with young children and a wife who depend solely upon him for income and other essential items as a father and husband. His Family ties are of extreme importance to him and should be to a sentencing court as well.[2]

Dr. Haider committed the offense owing to a variety of unique factors which occurred at the same time and for which he now completely understands and would never

---

[2] Recognizing that the point here is not for a "guideline departure," it must be noted that under the guidelines, family responsibilities have in the past resulted in departures well below the ordinary range. *U.S. v. Menyweather*, 431 F.3d 692 (9th Cir. 2005) ( in $500,000 embezzlement case, no abuse of discretion to depart 8 levels to probation in part because of defendant's care for daughter, which was unusual compared to other single parents); *U.S. v. Leon*, 341 F.3d 928 (9th Cir. 2003) (departure granted for defendant who was sole care giver of suicidal wife who also suffered from renal failure); *U.S. v. Aguirre*, 214 F.3d 1122 (9 Cir. 2000) (district court had discretion to depart downward 4 levels for the extraordinary family circumstance that defendant's 8-year old son had lost his father and would be losing his mother for substantial amount of time)

The Court is respectfully pointed to certain professional literature on the matter. For example: Ross D. Parke & K. Alison Clarke-Stewart, *From Prison to Home: Effects of Parental Incarceration on Young Children* (Dec. 2001), presented at U.S. Dep't of Health and Human Services National Policy Conference, and From Prison to Home: The Effect of Incarceration and Reentry on Children, Families and Communities (2002) (discussing impact of parental incarceration on children and benefits of alternatives to incarceration); U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention, Risk Factors for Delinquency: An Overview (2001) (discussing link between aggression, drug abuse, and delinquency in children to several factors, including separation from parents); The Sentencing Project, *Incarceration and Crime: A Complex Relationship* 7 (2005) ("The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been  demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality."); Patricia M. Wald, "*What About the Kids*?': Parenting Issues in Sentencing, 8 Fed. Sent. Rep. 137 (1995) (discussing growing body of research showing that children fare better in their parents' care than in foster care or elsewhere).

re-offend again. His conduct was aberrant. He is now aging out of recidivism as well. His acceptance of responsibility is extraordinary and insightful.

**The polygraph test**.

The defense urges the Court to consider the results of the polygraph test. The expert involved, Mr. Lielry, who's CV is attached to his report, among other qualifications, has been under contract with the United States Probation Department for the Eastern District of California for 10 years and has performed in excess of 100 polygraph tests on supervised releasees for the United States Probation Department, Eastern District of California. He is relied upon by them for accurate examinations.

The Court has the discretion at sentencing to consider the results of the test. *United States v. Cordoba*, 104 F.3d 225, 227 (9th Cir. 1997). "The per se *Brown* rule excluding unstipulated polygraph evidence is inconsistent with the 'flexible inquiry' assigned to the trial judge by *Daubert*. This is particularly evident because *Frye,* which was overruled by *Daubert*, involved the admissibility of polygraph evidence….'

In *Cordoba,* our Circuit then recited that "The only other circuit that has squarely addressed this issue held that a per se rule excluding expert polygraph evidence was overruled by *Daubert* and Rule 702. *United States v. Posado*,57 F.3d 428, 431-34 (5th Cir. 1995). The Fifth Circuit stated 'We do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case. We merely remove the obstacle of the per se rule against admissibility,

which was based on antiquated concepts about the technical ability of the polygraph and legal precepts that have been expressly overruled by the Supreme Court. We agree with the Fifth Circuit." Id at 434.

In light of Mr. Lierly's extensive qualifications, the fact that it is now 2025 and not 1997, and that he specifically is relied upon by our probation department, the Court should consider Dr. Haider's test results from the polygraph report.

**Dr. Soulier's Report**.

Matthew F. Soulier, MD., has evaluated Dr. Hader and provided a well-considered report addressing Dr. Haider's psychiatric, emotional and mental health, and his risk factors. The report establishes conclusively that Dr. Haider is clearly not of concern to this Court or the public at large to re-offend or present as a danger. Dr. Soulier's CV is also attached to his report.

With that summary, we now turn to the factors under 18 U.S. C. 3553.

**18 U.S.C. 3553 FACTORS.**

*(1) the nature and circumstances of the offense and the history and characteristics of the defendant;*

The offense is the possessing and then forwarding child sexual abusive material.

Dr. Haider did not produce it; he did not sell it. His history and characteristics favor a sentence well below the Guideline Range.

*(2) the need for the sentence imposed—*

*(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

The factors are well met by a 60-month sentence.

*(B) to afford adequate deterrence to criminal conduct;*

Again, a 60-month sentence will provide for adequate deterrence.

*(C) to protect the public from further crimes of the defendant;*

Reading Dr. Haider's letters, the report from Dr. Soulier and Mr. Lierly make it clear that the public ***does not need protection from Dr. Haider.***

*(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

The report from Dr. Soulier, the letters from Dr. Haider and his supporters, show clearly, he is no longer in need of any further vocation or correctional treatment.

*(3) the kinds of sentences available;*

A sentence of 60months, with a 10-year term of supervised release, is a sentence available and which conforms most with the law and the appropriate sentence.

*(4) the kinds of sentence and the sentencing range established for—*

*(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—*

The Guideline Range here is possibly inappropriately high even in a "normal" case, but Dr. Haider's brief participation in the crime, the situation under which he committed it, and the unique factors of his pre criminal behavior and then post criminal behavior rehabilitation, compel a finding that the range is simply too high.

Defendant is not seeking a "departure" as that term is commonly understood about a Guideline Range but is noting these arguments in support of this particular 3553 Factor.

Beginning a while back, our Circuit in *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011), the Ninth Circuit held that § 2G2.2 deserves little deference because it is "not the result of the [Sentencing] Commission's 'exercise of its characteristic institutional role,' which requires that it base its determination on 'empirical data and national experience[.]'" In *United States v. Dorvee*, 6 F.3d 174, 187 (2d Cir. 2010), the Second Circuit deemed § 2G2.2 "irrational[]" and found it to be "fundamentally incompatible with § 3553(a)" because, by pushing all child pornography offenders towards the maximum term, it "eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *See also United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010); and *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (("[W]e wish to express our view that [§ 2G2.2 is] in our judgment harsher than necessary. . . . [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like."). These decisions arose after the Supreme Court held in *Kimbrough v. United*

*States*, 552 U.S. 85, 109 (2007), that "[t]he crack cocaine Guidelines," mandated by Congress in the same manner as the § 2G2.2 guidelines, "do not exemplify the Commission's exercise of its characteristic institutional role," did not take account of "empirical data and national experience," and therefore lack persuasive force.

Then, in June 2021, the United States Sentencing Commission issued a report[3] entitled "Federal Sentencing of Child Pornography: Non-Production Offenses," which updated a similar report the Commission published in 2012.  In the 2012 Report, the Commission recognized that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections" and that "[a]s a result, the current sentencing scheme results in overly severe guideline ranges for some offenders." *Id.* at p. 321. The Commission recommended Congress take steps to remedy problems with the child pornography statutes and guidelines, but Congress has not acted. Because "Congress has not implemented the Commission's statutory and guideline recommendations," § 2G2.2 "remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 [report] still in effect. As a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often by imposing variances pursuant to 18 U.S.C. § 3553(a)." 2021 Report at p. 3.

---

[3] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf

*DEFENSE SENTENCING MEMORANDUM*
*9*

Dr. Haider notes that grounds exist to critically review guideline range based upon two factors the Commission recognized in its 2012 and 2021 reports. A variance is warranted to ameliorate the effect of guidelines §§ 2G2.2(b)(2), (b)(4), (b)(6), and (b)(7), which do not meaningfully distinguish one non-production defendant from another. These four enhancements occur in nearly all child pornography cases, where they are deemed to be "specific offense characteristics" that aggravate the base offense level. They require a *13-level increase* in offense level. The ostensible purpose of "specific offense characteristic" enhancements is to distinguish a particular defendant's crime from the heartland of child pornography cases and to enhance the sentences of the worst offenders. But the Sentencing Commission concluded that it is not reasonable to enhance the penalty for a crime beyond what is typical for a "specific offense characteristic" that is present in every case, or in most cases. The 2021 Report states: "The changes in computer and internet technology typically used by non-production child pornography offenders [have] rendered the sentencing scheme insufficient to distinguish between offenders with different degrees of culpability." *Id.* at p. 1 (footnote omitted). Regarding these common 13 levels of enhancements, the Commission in 2021 reported:

The 2012 *Child Pornography Report* explained that by fiscal year 2010, four of the six enhancements in §2G2.2(b) – together accounting for 13 offense levels – applied to the typical non-production child pornography offender and thus failed to meaningfully distinguish between more culpable and less culpable offenders.

In fiscal year 2019, these enhancements each continued to apply in the vast majority of non-production child pornography cases. Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases . . . .

Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders.

2021 Report at pp. 18-19 (footnotes omitted).

The charge of "distributing" child pornography as that term has been expanded for purposes of the child pornography statutes and guidelines, is not fairly considered significantly more culpable than possessing or viewing such a file on a computer, yet the latter carries no mandatory minimum sentence.

Recognizing this unwarranted disparity, the Commission noted in 2012 that Congress "may wish to revise the penalty structure governing distribution offenses to

reflect the evolution of technologies used to distribute child pornography and to differentiate between different types of distribution." 2021 Report at p. 2.

The act of distributing child pornography as Mr. Dr. Haider has done here differs little from possessing child pornography on a computer in terms of actual harm. Had Mr. Dr. Haider been permitted to plead to possession, his base offense level under § 2G2.2 would be 18 rather than 22, and his guideline range without the specific offense characteristics under § 2G2.2(b)(2), (b)(4), (b)(6) and (b)(7), would be almost half of what it is now. The Commission found that, for 2019, the average sentence for defendants convicted of *possession* of child pornography who receive the same specific offense characteristics as those recommended for Mr. Dr. Haider, was substantially lower. 2021 Report at p. 57. 81.7% of those offenders were sentenced below the guideline range. *Id*. In the same year, the most common distribution offender faced the same range calculation as the possession offenders except the base offense level started at 22 rather than 18; the resulting guideline range for these distribution offenders was obviously much higher. 2021 Report at p. 58. 85.8% were sentenced below the guideline range. *Id.*

With respect to the "specific offense characteristics" that drive these sentences skyward, the Commission found that the characteristics scored here in our case apply in nearly all cases, thus failing to distinguish one non-production child pornography offender from another.

As in *Dorvee*, the Second Circuit asserted, "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 [while] bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." 6 F.3d at p. 188.

Dr. Haider urges this Honorable Court to follow this reasoning in fashioning his sentence.

*(5) any pertinent policy statement— (A) issued by the Sentencing Commission.*

There are no policy statements which deter a 60-month sentence.

*(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;*

Similar Eastern District cases with substantially lower final sentences, but more serious behavior, require Dr. Haider's sentence to be as requested by the defense, and not the Guideline Range. *United States v. Randy Anger* (April 3, 2025) and *United States v Daniel Noble* (October 24, 2024). *Anger* is *at 24-cr-00316-DAD* and *Noble* is at *22-cr-00123-DJC*.

Defense counsel and defendant watched a few Eastern District cases like Dr. Haider's case while his was pending; cases that came in and were resolved in a similar time period. In *Anger,* he received a sentence of 60 months from the District Court; the Government recommended 70. The Sentencing Memorandum of the Government stated:

Anger first caught the attention of law enforcement in 2012, when HSI interviewed Anger based on a cybertip for downloading CSAM material. While Anger was not charged back then, he asserted that he had "put things behind him" and would not reoffend. PSR ¶¶ 54-58.

Unfortunately, that was not the end of his criminality. An FBI investigation led to the discovery that, in May 2021 on the Kik app, Anger was distributing CSAM to and receiving CSAM from Brent Hooton, who was charged and convicted separately of production and distribution of CSAM.1 PSR ¶¶ 10-17. In May 2021, Anger distributed at least two CSAM images to Hooton, and Hooton distributed at least 16 CSAM images and one CSAM video to Anger. *Id.*
In summer and fall 2021, HSI, and later FBI, pursued a separate lead which showed that Anger was associated with uploading CSAM material onto Kik in at least 2019 and 2021. PSR ¶¶ 18-22. The subsequent investigation led to a search warrant on Angers phone in November 2021, revealing that Anger was active on a Wickr chatroom called "Young girl lovers." Agents discovered that Anger received at least an additional four CSAM images on his Wickr app. PSR ¶¶ 27-30."

Docket at 21.  Government Sentencing Memorandum.

In *Noble,* with especially troubling conduct, he received a sentence of 87 months,

Docket 85, the Government Sentencing Memorandum argued:

The United States respectfully submits its sentencing memorandum concerning Daniel Joseph Noble, who was an active participant in a private Kik group devoted to sharing videos of children engaging in sexually explicit conduct. While serving as a youth and collegiate water polo coach, Noble shared at least 16 videos of minors being sexually abused or otherwise engaging in sexually explicit conduct with the Kik group called yungvidschilddd. PSR ¶ 4.

In compliance with the plea agreement, the government requests that the Court impose a low-end Sentencing Guidelines sentence, followed by 10 years of supervised release, $20,000 in restitution, and order special assessments of $5,100. In the spring of 2022, an undercover Federal Bureau of Investigation (FBI) Special Agent discovered that Noble was an active participant in a private Kik group (yungvidschilddd) devoted to sharing videos showing children being sexually abused and exploited. PSR ¶¶ 10-12. Noble shared videos with the Kik group on

at least five dates, and most of these videos depicted minors engaging in sexually explicit conduct. PSR ¶ 12; ECF No. 58 at 15. Some of the videos that Noble shared showed the sadistic treatment of children, with adults using foreign objects to penetrate prepubescent minors. ECF No. 58 at 15; PSR ¶ 12, 39. One video that Noble sent showed an adult woman anally raping a pre-pubescent girl, whose ankles were bound together with duct tape, with a foreign object, then repeatedly slapping the girl as she cried. PSR ¶ 12. Another video Noble shared showed an adult male anally raping a pre-pubescent girl with a foreign object, then ejaculating in her mouth and on her face. PSR ¶ 12. Further investigation revealed that Noble worked as a water polo coach for UC Davis and the associated youth water polo club. ECF No. 1 at 6.

Law enforcement agents executed a search warrant at Noble's residence. ECF No. 1 at 6. During an interview, Noble admitted participating in the private Kik group and having sent files of child sexual abuse material to its members. ECF No. 1 at 7. Investigation on behalf of the University of California at Davis found no evidence that Noble committed sexual misconduct against anyone associated with the university or associated athletic programs. PSR ¶ 20.

The files that Noble distributed depicted victims from nine known series of child pornography files, four of whom filed requests for restitution. PSR ¶¶ 23-29. The victims in those series were located by investigators throughout the world. One victim of Noble's conduct wrote, specifically for this case, "No one who has sexualized feelings and thoughts about minors should ever be placed in an authority position over them, and who is to say that it was any safer for him to coach college students?" ECF No. 50-1. That victim also wrote, "Imagine feeling like you are constantly living in a hypervigilant state, always on the lookout for danger. You desire connection with others, yet you fear what lurks in the shadows. . . ." The mother of another of Noble's victims wrote, "I urge you to ensure that justice is served for the victims of the water polo coach's alleged actions. We must send a clear message that such reprehensible actions will not be tolerated. . . ." ECF No. 50-2.

A law enforcement team arrested Noble on May 19, 2022, and the Court issued a criminal complaint for distribution of visual depictions of minors engaged in sexually explicit conduct. ECF No. 1. The Court set conditions for Noble's release, including a $100,000 signature bond, with conditions including location monitoring, not accessing the internet, and not using or possessing a device capable of accessing the internet. ECF Nos. 6, 7. The Court, upon the parties' stipulations, modified and clarified some of those conditions during the duration of the case. ECF Nos. 21, 28, 37. The grand jury returned an indictment, alleging three counts

of distribution of visual depictions of minors engaging in sexually explicit conduct. ECF No. 13. Noble's Instagram account was active during November of 2022 and again in July and August of 2023, leading to an investigation into contempt of a court order. PSR ¶ 7. Although the evidence from that investigation appeared to indicate that Noble had been accessing the internet in violation of his bond conditions (PSR ¶ 7), neither the government nor Pretrial Services moved to revoke his pretrial release status. PSR ¶ 3.

Docket at 80.  Government Sentencing Memorandum.

The conduct of Dr. Haider, the conditions under which it occurred, his peculiar and unique situational trauma and adverse childhood experiences, his post offense rehabilitation, his family ties, and the various other  factors including but not limited to the tests of Dr. Soulier and Mr. Lierly, compel a sentence well below a Guideline sentence, especially as compared to the sentences of these similarly situated persons recently sentenced in the Eastern District.

*(7) the need to provide restitution for any victims of the offense.*

Defendant stands ready to provide appropriate restitution to the best of his ability; his incarceration would only impede that.

## CONCLUSION

The 3553 Factors, when applied to Dr. Haider's matter, compel this Court to sentence him to a term of 60 months (5 years).

Dr. Haider and counsel will speak at sentencing to address any issues of import to the Court.

Dated: December 9, 2025                    Respectfully submitted,


                                           */s/ Mark J. Reichel*
                                           MARK J. REICHEL
                                           Attorney for Defendant