**REICHELLAW PC**
**MARK REICHEL, State Bar #155034**
455 Capitol Mall, Suite 802
Sacramento, CA 95814
Telephone: 916.548.7398
Facsimile: 888.505.9331
Email: mark@reichellaw.com
www.reichellaw.com

Attorney for Defendant
KHURSHEED HAIDER

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 23-CR-00299 DC |
| Plaintiff, | ) EXHIBITS FOR DEFENSE<br>) SENTENCING MEMORANDUM |
| vs. | ) Date: December 19, 2025 |
| | ) Time: 9:00 AM |
| KHURSHEED HAIDER, | ) HON. DENA M. COGGINS, |
| Defendant | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| | ) |
| | ) |

## EXHIBITS FOR SENTENCING MEMORANDUM

Included hereto are the following exhibits supporting defense counsel's sentencing memorandum:

1. Defendant Khursheed Haider's letter to the Court.

2. Letters in support of defendant to the Court.

3. Defendant's polygraph results with polygrapher Jeff Lierly's CV.

4.  Defendant's psychiatric evaluation results. Examination and evaluation were
    provided by Dr. Matthew Soulier. Dr. Soulier's CV is included.


Dated: December 11, 2025               Respectfully submitted,


                                       */s/ Mark J. Reichel*
                                       MARK J. REICHEL
                                       Attorney for Defendant

**CASE 2:23-CR-00299-1**

**KHURSHEED HAIDER**

**DEFENSE SENTENCING MEMO EXHIBITS**

**EXHIBIT 1.**  Defendant Khursheed Haider's Letter to the Court

Honorable Judge coggins,

I dont know where to start, but one thing is clear, I was a participant in contributing to an evil community causing harm to the children and society. It will never happen again, in fact, I will be a source of destroying the business and save our kids.

During my two year detention, I had the chance for personal reflection and found out that it's not just as simple as looking at videos. It creates a business market of exploitation of our kids. They feed us free old videos to keep us hooked/addicted to it and generate revenue by selling new content which makes our kids more vulnerable. It's the same business model of social media, giving a lot of free content to generate online traffic and charge for new content. If there are no consumers or no demand (watchers/on lookers) of these videos, there will be no new production and sale of that evil content. It's only through actions of people like me (consumers) to stop watching those videos, not going to those platforms andwebsites, we can disrupt this evil business and save our children

I have already decided to join hands of our law enforcement and do my part to educate, prevent and help people from getting out from this dark pit.

- It's clear that the news of my arrest has spread across states and countries. I am sure people known to me in the New England area, Pakistan, Canada, UK and Australia are aware of my crime and deter from doing anything like that embarrassing

- I am already educating my fellow detainees about the harm we have done to our kids and society. Its the first thing to understand and accept it. Government is not against us, its for our own safety. safety of our kids and safety of the society as a whole

- we have started the porn/sex addiction emotional recovery group, The Freedom Fight (TFF). It's a source to identify own personal weakness and use different tolls to identify eaarly triggers and control our behavior. It strengthens our connections with GOD to seek help againt evil

- I reached out to my Muslim community, they are aware of my crime. I shared with them TFF group activities and different strategies to prevent them from getting into this addiction

- As soon as I am released from imprisonment, I will not hide from society. I will tell them my story as an example not to be a consumer or helper of this dark illegal business but to join hands in defeating this evil enemy.

I am ashamed that my actions have caused damage. I am sorry to all those children and their familiers. I wish there could be a way I could undo all those things. I am sorry to let down my Muslim and Medical communities. I was sorry to my friends, neighbors, patients, and their families as to bring such a shameful affiliation with me.

Last but not least, I am sorry to my beautiful wife Shahla and my four lovely kids. Shahla has to go through this rough journey becuase of me. I have brought financial hardships (sole bread earner), social embarrassment and psychological trauma. I caused my eldest daughter (Madiha) to lose a year of college. I lost my connection with my teen daughter (Warisha) to do softball practices and support her at games. I abandoned my little ones (Hanzala and Alishba) at the time they needed me most growing up. Talking to them, making them laugh, running with them and having pretend tea parties with Alishba. I cannot forgive myself for my son (Hanzala) who looks for me in my room, tries to find me in social gatherings among other men and asks every day to his mom, "when are we going to pick up daddy?".

I hope and Pray to God for his forgiveness and to give me strength to overcome this evil and make me among the righteous.

Respectfully,

Khursheed Haider, MD

**CASE 2:23-CR-00299-1**

**KHURSHEED HAIDER**

**DEFENSE SENTENCING MEMO EXHIBITS**

**EXHIBIT 2.**   Letters in Support of Defendant to the Court

1. Asim Mirza
2. Ayub Haider
3. Bilal Basheer
4. Dr. Arshad Ali
5. Dr. Jawad Arif
6. Dr. Shahid Ahmed
7. Dr. Zulfiqar A. Chaudhry
8. Imam Azeez
9. Omar Chaudhry
10. Yousef Haider
11. Thomas Lopez (1)
12. Rod Githens (2)

Asim Mirza.
1989 Two towers way
Rocklin CA 95765.
asimmirza72@yahoo.com

12/21/2024

United States Attorney's Office.

I am writing to provide a character reference for Dr. Khursheed, who has come to your attention in the course of legal proceedings. I have had the privilege of knowing Dr. Khursheed since 2014 in my capacity as his real estate broker, during which time I have developed a deep respect for his character and professionalism.

Dr. Khursheed is a dedicated doctor whose commitment to his patients and community is evident in his actions. He is a devoted family man who values integrity, kindness, and generosity. Over the years, I have witnessed his compassionate nature and unwavering support for others, whether through his medical practice or his personal relationships.

While I understand the seriousness of the current situation, I firmly believe that he might be suffering from an emotional or physical condition that caused his behavior. I also believe that he will correct those issues, or more likely has corrected them already.  I hope that Dr. Khursheed's long history of contributing to the community and upholding high standards should be considered.

Please feel free to contact me at the above mentioned address. I would be happy to discuss it further.

Sincerely,
Asim Mirza.

To

United States Attorney's Office

Sacramento, California

**Subject:** Regarding Dr. Khurshid Haider

Dear Attorney,

I am Ayub Haider, the elder brother of Dr. Khurshid Haider, who is currently undergoing trial in Sacramento. I am writing to provide insight into my brother's character and to offer any assistance or information that may help in this matter.

Dr. Khurshid Haider is the youngest among our siblings, and as his immediate elder, I have closely observed him since childhood. He has always been a noble, honorable, and kind-hearted individual who commands respect from his peers and is widely regarded as a gentleman within the community. As a professional doctor, his dedication and commitment to his patients have been exemplary.

I am Brigadier General in Pakistan Army, I met an incident where I lost my vision of both eyes and functioning of left hand. In this critical time of my life Dr. Khurshid flew from US in no time and taken care of me from initial days till recovery. I am highly embedded of his caring, loving and truly professional dedication towards me

The charges leveled against him are indeed serious, but based on my personal experience and understanding of his personality, they are entirely inconsistent with the person I know. Dr. Khurshid has always been regarded as a kind-hearted and gentle individual by his colleagues and society.

Although I am located approximately 11,000 kilometers away from Sacramento, I am readily available to provide any additional information or support regarding Dr. Khurshid Haider. Please do not hesitate to contact me if required.

Sincerely,

Ayub Haider

[ayub_haider@yahoo.com]

To

United State Attorney's office

Sacramanto, California

Respected Attorney,

I hope this letter finds you well. My name is bilal basheer I am from karachi pakistan and nephew of Dr.Khursheed Haider who is under trial in sacramento. As I have the privilege of knowing him personally since my childhood and I wish to provide insight into his character and the positive impact he has made throughout his life on me and my family.

I would like to bring your kind consideration in to an incident in 2013 when I had an accident while crossing the raod and I suffered a severe backbone injury and the chances of me getting paralyzed were very high and I couldnt even afford my treatment.In such critical    time Doc khurshid proved to be an angel for me. He came from US with his family and became a support for me and my family, infact he took care of my all financial and medical matters during that difficult time.I remember there was a delay in taking decision here for my backbone surgery, in such situation Dr. Khurshid consulted his senior doctors in US and asked the doctors here to do the surgery hence after a successful operation and by the grace of almighty Allah I escaped a major disability.Since then, he has been the one who oversees my medications and medical follow up.

I can confidently witness his honesty, kindness and unwavering sense of responsibility. He has always been a person of strong ethical principles, and I have witnessed firsthand his dedication to his work. As a medical professional, Dr Khurshid has consistently demonstrated compassion, empathy, and a deep commitment to the well being of his patients. He approached every situation with fairness, respect and moral resposibility. Beyond his professional accomplishments, he is caring family member and respected member of our community.

If you required any further information regarding my uncle's life, I would be more than happy to provide it.

thank you for taking the time to consider this refernce.

sincerely,

Bilal Basheer

Nephew of Dr Khurshid Haider

bilaltanoli28@hotmail.com

12/18/2025

**To the United States Attorney's Office**

**Re: Character Reference for Dr. Khursheed Haider**

I am writing to provide a character reference for Dr. Khursheed Haider, whom I have had the pleasure of knowing both personally and professionally for several years. Our acquaintance dates to 1994 when we were fellow medical students in Karachi, Pakistan. Since then, Dr. Haider and I have become friends. He pursued further medical training in the United States, and we have had the opportunity to work together at a hospital in Sacramento, California.

Throughout my years of acquaintance with Dr. Haider, I have witnessed firsthand his dedication and hard work as a physician. He has earned an outstanding reputation among his peers, nurses, patients, and support staff for his commitment to providing exceptional patient care. Dr. Haider is known for his collaborative spirit, continuous pursuit of medical knowledge, and unwavering dedication to his profession. He is highly respected and well-liked by all members of the hospital team, including the nursing staff.

While I understand the seriousness of the matter before the court, I truly believe that this incident is not reflective of the person I know to be. I am confident that he has the potential to learn and grow from this experience and continue to contribute positively to society. Throughout our association, Dr. Haider has consistently demonstrated himself to be a dependable, trustworthy, and upstanding individual.

Thank you for taking this letter into consideration as part of your deliberations. If you require any further information or have questions about my perspective, please do not hesitate to contact me.

Sincerely,


Dr. Arshad Ali

Email: Arshadali91@hotmail.com

Cell: 1-347-223-7416

Jawad Arif

916-616-6394

12/28/24

United States Attorney's office

Sacramento, California

Subject: Character Reference for Dr. Khursheed Haider

I am writing this letter in support of Dr. Khursheed Haider, who is currently facing criminal charges. My name is Jawad Arif, and I have known Dr. Haider since 2004.

I first met Dr. Haider in New York through some mutual medical school friends while we were all preparing for residency training applications and interviews. After several meetings in New York, we reconnected in Roseville, California, when Dr. Haider moved to work at Mercy General Hospital. Over time, our families became close friends as we both lived in Roseville.

Throughout the years I have known him, Dr. Haider has proven to be a valued colleague, demonstrating professionalism, sincerity, and a genuine willingness to help those around him. We worked together for several years at the same facility, where I witnessed his unwavering dedication to providing the highest level of care for his patients. He always approached his work with compassion, integrity, and a deep sense of responsibility.

In addition to his professional accomplishments, Dr. Haider has been a devoted husband and father. During our family gatherings, he consistently displayed love, patience, and attentiveness toward his wife and children. He was deeply committed to fostering a nurturing and supportive environment for his family, prioritizing their well-being, education, and happiness. As a husband, he exemplified respect, understanding, and steadfast support for his spouse.

Beyond his family and professional life, Dr. Haider has also contributed meaningfully to various community projects. His actions reflect a deeply caring individual who is committed to making a positive impact on those around him.

While I am not in a position to comment on the specifics of the charges against him, I can confidently attest to Dr. Haider's positive character and the beneficial influence he has had on those who know him. I believe that any lapses in his behavior may have been influenced by emotional or physical challenges he was experiencing at the time. It is difficult to reconcile the allegations with the person I have known, and I sincerely hope this matter is resolved fairly and justly.

Thank you for considering this letter as part of the broader assessment of Dr. Haider's character. Should you require any additional information or wish to discuss my perspective further, please feel free to contact me.

Sincerely,

Jawad Arif

To the United States Attorney's Office

Re: Character Reference for Dr. Khursheed Haider

I am writing to provide a character reference for Dr. Khursheed Haider, whom I have had the pleasure of knowing both personally and professionally for several years.

I know him since school life, and he was my neighbor too. He was also my fellow friend during my medical studies in Karachi, Pakistan from 1994 till 1999. He was very good friend mine.

He was very brilliant and hard working personality and very sincere doctor and always very concerning for the patients. He had very good reputation among his peers, nurses and patients.

He is highly respected and well-liked by all members of the hospital team, including the nursing staff.

I think whatever he did was totally in mistake and without knowing the seriousness of this guilty act.

I am very confident that he had learn a lot from this mistake and kindly give him chance to live normal life.

Thank you for taking my words, regading Dr Haider's character.

If you require any further information, please do not hesitate to contact me.

Thanks and regards


Dr. Shahid ahmed

E mail:

sa.abbasi2015@gmail.com

Cell: 03012137419

To the United States Attorney's Office:

I am writing to you regarding Dr. Khursheed Haider. My name is Dr Zulfiqar A Chaudhry and I have known Dr. Haider since 2010.

I know Dr. Haider to be a kind, generous, humorous, and upright person. We met almost every week. After the Friday congregational prayer, we would hang out and discuss different things, from local politics to international events, from our kids' exams to our upcoming vacations, from new restaurants to religious events, from our elderly parents to our complex patients. I always found him to be insightful and funny. He helped me see issues from different angles. His analysis often enriched my understanding of the issue, while opening my eyes to different possibilities that I initially considered.

Dr. Haider is also one of the best intensivist physicians! I often picked his brain on many of my difficult patients (while respecting patients' confidentiality). For example, when my mother-in-law died in Pakistan from medical negligence, I consulted him. I was not sure what exactly happened. As I gave him the details of her symptoms and relevant results, he was able to arrive at the most likely diagnosis (acute cholangitis), with in minutes. I was amazed at the speed with which he arrived at the diagnosis when I and Pakistani physicians struggled for months. Indeed, Dr. Haider is a superb physician!

He has helped countless sick patients, with exceptional compassion. One can call on him in the middle of the night and he will help them without any complaints. He has a wealth of knowledge that he freely gives to help people. If I or any of my loved ones are sick, I would want him to be our doctor!

I am aware of the charges against him, but given my personal experience with him, his excellent character and compassionate demeanor, he must have some psychological or physical condition that caused his behavior. Nevertheless, I stand behind him. He is such a gem! It will be such a waste of talent and intellect to put him behind bars. I am confident that he will do whatever is necessary to address his illness. I firmly believe that he will not offend again.

If I can be of any help, please let me know. I am more than willing to speak to the Judge in Court when the time comes.

I respect and love him too much to see him suffer thus!

Sincerely,

Zulfiqar A. Chaudhry
7684 Belle Rose Circle
Roseville, CA 95678
Cell: 916-846-5857



**Tarbiya Institute**
Perpetual . Personal . Progress

☐ (916) 800 - 4111
🌐 info@tarbiya.org
✉ www.tarbiya.org

**Letter of recommendation**

December 20, 2024

Re: Khursheed Haider

In my capacity as the Senior Imam of the Tarbiya Institute, I have come to know Khursheed Haider as an active congregant and member of our community for 10 years. He attended our weekly services on Fridays and enrolled his children in our educational programs.

I have seen Khursheed and conversed with him on numerous occasions and have always found him to be respectful and cordial.

Khursheed Haider's daughter was friends with my daughter and attended the same study circle at the mosque with her.

Khursheed Haider supported our mosque regularly and contributed to our fundraising events. He also volunteered his time occasionally when he was available.

If you have any questions, please don't hesitate to contact me directly.


Thank you,

M. A. Azeez



Senior Imam
Tarbiya Institute
m.azeez@tarbiya.org
916-800-4111

Omar Chaudhry
916-616-6394


12/28/24


United States Attorney's Office
Sacramento, California


Re:  Character Reference letter for Dr. Khursheed Haider


To Whom It May Concern,

I am writing this letter in support of Dr. Khursheed Haider, who is currently facing criminal charges. I've known him and his family for about 10 years now. Our relationship developed through shared connections in the Muslim community and mutual friends, and over the years, my family and I have gotten to know him and his family quite well.

Dr. Haider has always been a generous and kind person in my experience. On several occasions, I approached him for donations to support local nonprofit initiatives, and he consistently contributed without hesitation. His willingness to help reflects his genuine care for the community.

As a family man, Dr. Haider has shown love and devotion to his children and wife. During gatherings, I observed how much his youngest son enjoyed spending time with him, which demonstrated the strong bond he shared with his family. He has also been a pleasant and thoughtful member of our social circle, treating everyone with respect and understanding.

I am aware of the charges against Dr. Haider, and they are indeed serious and concerning. I find it difficult to reconcile these allegations with the person I have come to know. He never spoke about any personal struggles and consistently presented himself as a positive individual. Even after his neck surgery, his optimistic character was evident in his demeanor. I believe this situation may reflect a lapse in judgment or behavior influenced by stress, physical or emotional challenges, or other circumstances he might have been facing. The person I know, given the time he has had to reflect over the past year, would likely take the necessary steps to address the issues he is facing, if he hasn't already begun doing so.

If further information is required, I am available to discuss my experiences with Dr. Haider as needed.


Sincerely,
Omar Chaudhry

**December 22, 2024**

**To,**
**United States Attorney's Office**

**California**

I am writing to you regarding Dr. Khursheed Haider

Khursheed is my younger brother and we were raised together in a close knit family.

He is not only a beloved member of our family but is also very likeable within the broader community. His compassionate nature and willingness to help others have earned him the admiration and respect of those who know him.

Throughout his life, Khursheed has been a pillar of support for our family. Whether it was addressing our parent's medical needs or helping relatives through his medical expertise or financially, he was always present.

Also, he has gone out of his way to mentor and guide many medical students in the family and in the community, fostering their growth and success.

The charges against him are indeed very serious, but they do not align with the person I have known all my life. He is a man of integrity and kindness, and his history is a testament to his selflessness and professional dedication.

I have had the opportunity to meet him during my last two visits to Sacramento, and I have found him deeply remorseful about the situation he finds himself in. He has expressed repeatedly how much he wishes this would have never happened and he could undo whatever he has done. This regret is genuine and reflects his introspective and responsible character.

I am certain that whatever actions have brought him to this trial were driven by work stress or a temporary physical conditions.

I am planning to visit Sacramento during his final trial period, and I am willing to speak to the honourable judge in the court or to cooperate in any other way the authorities require. In the meantime, I can be contacted at the email address or phone number provided below at any time.

Best regards
Yousuf Haider
yousufhaider@hotmail.com
+44 79575 42933

Honorable Judge Coggins,

My name is Thomas Lopez (USMS# 12225-506), and I am a pre-trial detainee currently housed at Taft Community Correctional Facility (TCCF). I would like to share with you my first-hand account regarding Mr. Haider. For context, I arrived at TCCF on ~Sept. 25, 2024 - and Mr. Haider was one of the detainees already housed here in the A4 pod. The pod is a dormatory where the number of detainees fluctuates between ~16-45. We eat, sleep, exercise, and clean together among the same group of people. He was of course quite welcoming and friendly - offering assistance and someone pleasant and intelligent to converse with. I have observed this same spirit and manner of helpfulness, generosity, and compassion from him to all persons in our pod.

I would primarily like to relay to you information about Mr. Haider's participation in a pornography/sex addiction recovery group I started here at Taft CCF in May 2025. Many facilities offer drug and alcohol addiction programs but pornography/sex addiction therapy and group support is nearly non-existent among incarceration institutions.

- Our inititiative is based upon a 20+ year program called **The Freedom Fight (TFF),** founded by Ted Shimer, a licensed addiction therapist and a pastor. The program utilizes the latest data on neuroscience to explain the mechanisms of pornography/sex addictions - and helps to explain what thoughts and actions fuel this addiction. The program teaches participants to employ tracking tools to identify triggers in our environment and provides cognitive behavioral therapy techniques to interrupt unwanted thoughts and behaviors. It teaches that a true relationship with God helps those in recovery to remember their priorities and stay away from this corrosive addiction. The program reports an 86% recovery rate for participants who complete the program and continue to practice the core habits (self-monitoring, accountability, recovery group participation).

- Mr. Haider has already completed the individual course and utilizes his medical degree to add a substantial level of knowledge and insight into the biochemical and psychological aspects of addiction. It should be stated that Mr. Haider speaks to all of us with complete respect, does not talk down to anybody (we have participants with no H.S. education and others with multiple techincal and graduate degrees).

- He brings a fantastic spiritual perspective to the group. The TFF program is designed with a Christian theological foundation, but Mr. Haider approaches all the discussions with an open perspective, an intellectual curiosity, and he shares parallels with the teaching of Islam to make the lessons universally applicable. In fact our group is quite diverse; with Protestant, Catholic, Muslim, Agnostic, Athiest, and other religious perspectives all represented.

- We have been in contact with the national organization of TFF and it was stated ours is the first recovery group formed inside a correctional facility that they have ever heard of. Based upon our group's feedback they are sharing our group's story on their website and app - to help others form similar recovery groups and encourage those struggling even outside institutions to continue seeking recovery - no matter the circumstances.

- Our communications to TFF organization has prompted them to **release a group facilitator manual, create two new additional instructional videos, and two exercises** on the Edovo platform - providing a roadmap for more self-run sex/porn addiction recovery gorups in other institutions. This platform is carried in >1200 institutions and has >1 million users like us. It has the potential to improve the lives of many other people and help them recover from this awful, gripping addiction and become better members of society.

I will also make a few other observations about Mr. Haider which I would like to submit:

- He has been a source of harmony and peace in our dorm. He approaches everyone - regardless of background

1

(ethnicity, religion, orientation, education, economic status, etc.) and is respectful and kind.

- Mr. Haider has organized group activities in our pod such as charades. As trivial as that may sound to someone on the outside - it takes gumption and a diplomatic touch to gather people of many different backgrounds together (some with violent offense records and drug additions, others with sex crime charges) and talk them into acting foolishly in a "tough-guy" environment; getting people to drop their guard and laugh together. It has been great for relieving group tension, building cohesion, and providing some much-needed levity for those of us going through the absolute worst moment of our lives away from our families.

- Mr. Haider also organized a book and news discussion group - as well as a forum for people to present to the dormatory talks on subjects they have specialized knowledge about ("T-Talks"). All of these activities create an exchange of ideas and a transfer of knowledge through reflective, pro-social engagement. Topics run the gamut from competitive athletics to specialized agriculture to life-transforming spirituality/philosophy.

Thank you for taking the time to read this letter. I appreciate you considering this information about Mr. Haider's character, conduct, and contributions that have been observed while in the A4 pod at Taft. I cannot overstate his contribution to the success of our Freedom Fight sex/porn addiction recovery group and the changes it has made in our own lives  - and hopefully many thousands more in the future. But beyond that, I would like to say for what it's worth: I have been around him 24 hours a day for over a year now, and the following things are readily apparent to me - he *is* a good man; thoughtful, aware of his mis-steps in life, genuinely remorseful, fully committed to change, dedicated to God and his family. If you have any questions about my statements, please contact me or my attorney.

Thank you and God bless,

*Thomas H Lopez*

Thomas Lopez
USMS: 12225-506
A4 #47
P.O. Box 925
Taft, CA 93268-0006

Pete Jones (Attorney)
Wanger, Jones, and Helsley PC
265 E River Park Cir, Suite 310
Fresno, CA 92730
559-233-4800

October 14, 2025

Dear Honorable Judge Coggins:

I'm a federal detainee at Taft CCF and have had a bunk next to Dr. Khursheed Haider since May 2024. As you might imagine, in such close quarters, I'm in a good position to observe his patterns and behaviors, perhaps better than anyone at Taft.  He's a caring, empathetic individual who has experienced great growth during this time of incarceration.

From my first day meeting Khursheed in April 2024, I had an impression of him as a kind and generous person. A day or so after my arrival with 10 other individuals, Khursheed offered me a bag of coffee without any discussion of repayment. I quickly saw this as his default way of treating newcomers and those in need. Khursheed frequently puts items from the commissary on the bunks of new and indigent detainees without taking credit. I also see him giving to those in need, both materially and in helping with personal, legal, spiritual, or health issues. He's very empathetic. He has stood up for those being bullied and perceives when someone is experiencing personal problems. I'm a very private person about personal problems and when I've experienced issues, he's checked in on me because of perceiving that I was dealing with an issue. I've really appreciated having him as a trusted person to talk with about various issues.

With Khursheed, I've participated in an accountability and learning group called Freedom Fight for people with sex and pornography addictions. The growth I've seen with Khursheed has been tremendous. From the start, he had a lot of shame and regret around the behaviors that led to him being arrested. But, I've seen that shame transform into genuine remorse for both his actions and the impact his actions had on victims. Khursheed has moved beyond shame and despair about the potential sentence to focus on his own rehabilitation and ensuring he never has this problem again.

During my 2.5 years of incarceration, I've lived with an estimated 300+ other detainees here and in county jail, many of whom have similar charges. Many portray themselves as victims of an overly harsh justice system or do nothing to ensure they won't reoffend. Khursheed is one of the most genuinely remorseful people I've seen. Not only is he remorseful, he's taking steps every day to contribute to his rehabilitation. In addition to faithfully praying five times a day, he also studies the Qu'ran and other religious texts. He's applying spiritual and psychological tools to prevent addiction relapse and he's relying on God and others to support him. Khursheed and I have had deep, serious conversations about what led him here, what he can do to make ammends, and how he can ensure he never reoffends. He's serious and sincere about this commitment.

Were he released today, he would not be a danger to his community. From a punishment perspective, I know it breaks his heart every day to not be with his wife and kids. Both he and his family have suffered a great deal over his absence. He also lost a career as an ICU doctor and I can tell from the stories he tells that he had a unique passion and heart to care for his patients.

While in Taft, Khursheed has made the most of his time by learning, growing, reflecting, and contributing. He has started two helpful programs, in a facility that sponsors no official programs. He started a book discussion group and a weekly "Taft Talks" forum where detainees share their knowledge and insight about a chosen topic. Both programs have been well received and have benefited our population here.

Although I'm also a detainee, this is the first letter I've agreed to write for someone, despite having helped many people with various personal matters. I don't take my endorsement of someone lightly, particularly in this environment. I can sincerely say that Khursheed is unique among people I've met while incarcerated. I hope you see fit to take my experience of Khursheed into consideration in determining his sentence.

Sincerely,

Rod Githens

**CASE 2:23-CR-00299-1**

**KHURSHEED HAIDER**

**DEFENSE SENTENCING MEMO EXHIBITS**

**EXHIBIT 3.** Defendant's Polygraph Results

Polygrapher Jeff Lierly's CV

## Polygraph Examination Report

**Mansfield Lierly and Associates**
**3800 Watt Avenue, Suite 212**
**Sacramento, CA 95821**
**(916) 710-1030**

| Examinee Personal Information | | Photo |
|---|---|---|
| Name: KHURSHEED HAIDER | | |
| Date of Birth: 07/07/1975 | Age: 50 | |

| Examination Information | | Fingerprint |
|---|---|---|
| Exam Location: Taft Community Correctional Facility – Taft, CA | | |
| Exam Date: 12/03/2025 | | |
| Case #: 25-0209 HAIDER | | |
| Examiner: Jeff Lierly | Phone: (530) 510-3989 | |
| **Final Call:** **No Deception Indicated** | | |

| Requestor Information | |
|---|---|
| Requestor Client: Mark Reichel / Khursheed HAIDER | |
| Requestor: Mark Reichel | |
| Report To: Mark Reichel | |
| Exam Type: Criminal | |

## Section 1:  Purpose of Examination

In mid-November 2025, I was contacted by Attorney Mark Reichel with a request to conduct a polygraph examination on Khursheed HAIDER, an incarcerated person at the Taft Community Correctional Facility, who is awaiting sentencing on federal sex crimes charges.

The focus of this examination is whether HAIDER, ever in his adult life, engaged in any prior physical sexual contact with a minor.

## Section 2:  Pre-Test Interview

On 12/03/2025, the examinee (HAIDER) voluntarily submitted to a polygraph examination.  During the pre-test interview, the examinee read and signed the consent form agreeing to the test and waiving the rights set forth in the document.  The examinee was advised that the entire examination would be recorded using both audio and video.  I assessed HAIDER for testing suitability, and in my opinion, he was suitable for testing.

Following my standard explanation of polygraph, I discussed the central issue for the exam regarding any prior sexual contact with any minor after he became an adult.  I defined physical sexual contact as sexual intercourse, oral sex, and/or any physical touching or being touched on / by one's penis, buttocks, vagina, or breasts whether over or under the clothing. I defined a minor as anyone age 17 or under and an adult as anyone 18 years of age or older.

Confidential

## Polygraph Examination Report

**Mansfield Lierly and Associates**
**3800 Watt Avenue, Suite 212**
**Sacramento, CA 95821**
**(916) 710-1030**

I asked HAIDER if he had ever had any form of physical sexual contact, as defined above, with any minor when he was an adult, and he said no.

At the conclusion of the pre-test phase of the polygraph examination, I discussed and thoroughly reviewed all the test questions with the examinee. The purpose of this detailed review is to provide the examinee an opportunity to ensure he completely understands the questions before the onset of the testing phase of the examination.

## Section 3:  In-Test Phase

A Lafayette LX6 computerized polygraph system was used for the collection of polygraph test data. This instrument makes a continuous recording of autonomic responses associated with respiration, electrodermal activity, and cardiovascular functioning. The instrument also includes sensors designed to record peripheral behavior activity and cooperation during the examination. A functionality check prior to the examination confirmed the instrument was in proper working order.

I first administered an acquaintance test to HAIDER. The purpose of an acquaintance test is to allow the examinee to acclimate to the testing environment and the examiner to adjust the components, if necessary, and the sensitivity of the examinee's physiological tracings.

For this polygraph examination, I administered a single-issue technique nearly identical in structure to the Federal You Phase technique. I recorded three full charts of HAIDER's physiological data. According to data published in the American Polygraph Association meta-Analytic Report on Validated Techniques published in 2011, the Federal You Phase technique scored with the Empirical Scoring System (ESS) produced average decision accuracy of 90% and a false negative rate of 3.4%. (A false negative in the deception detection field is when a deceptive person is incorrectly classified as truthful.)

The following pertinent questions were asked during the polygraph examination:

- *R4:  As an adult, have you ever had physical sexual contact with a minor? No*
- *R6:  As an adult, have you engaged in any physical sexual activity with any minor? No*

## Section 4:  Result

I scored HAIDER's test data using the ESS and calculated his grand total score at +10 which exceeded the required cut score of +3 for a truthful classification. In my opinion, HAIDER **was truthful** during testing. The odds of truthfulness are calculated at 12.8 to 1 for a person achieving this score on their exam. (Refer to the attached ESS, Multinomial Report.)

HAIDER's data was also analyzed by the polygraph algorithm, Objective Scoring System 3 (OSS 3) with the following result:

**p-value: less than 0.001 probability this result was produced by a deceptive person.**

(Refer to the attached OSS 3 report.)

Therefore, the final result is **No Deception Indicated**.

## Section 5:  Post-Test Interview

During the post-test phase of the exam, HAIDER was informed of the test results and provided no additional information.

*Note:* The polygraph tests and allied documentation are retained for three years.

**Confidential**

## Polygraph Examination Report

**Mansfield Lierly and Associates**
**3800 Watt Avenue, Suite 212**
**Sacramento, CA 95821**
**(916) 710-1030**

_____

**Examiner: Jeff Lierly**

Oregon General Polygraph License #87808
Certified Forensic Law Enforcement Polygraph Examiner #5064 (American Association of Police Polygraphists)
Certified Polygraph Examiner #160 (California Association of Polygraph Examiners)
Certified Post-Conviction Sex Offender Testing Polygraph Examiner (California Association of Polygraph Examiners)

# Empirical Scoring System, Multinomial (ESS-M) Report

| | |
|---|---|
| **Examinee** | **KHURSHEED HAIDER** |
| **Result** | **NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** |
| **Posterior odds** | **12.8 to 1 odds of truth (.93)** |
| Lower limit | 5 to 1 (.83, one tailed alpha = .05) |
| Prior odds | Deception 1 to 1 (.50)          Truth 1 to 1 (.50) |
| Bayes factor | 12.8 |
| Decision Rule | Two-Stage Rules |

| Questions | |
|---|---|
| R4 | As an adult, have you ever had physical sexual contact with a minor? |
| R6 | As an adult, have you engaged in physical sexual contact with any minor? |
| | |
| | |

| Test Details | |
|---|---|
| 25-0209 HAIDER | |
| Exam Date | 12/3/2025 |
| Examiner | |
| Report Date | 12/4/2025 7:20:30 AM |

| Question Scores | | |
|---|---|---|
| Questions | Lower limit | Result |
| R4 | 0.00 | NDI/NSR |
| R6 | 0.00 | NDI/NSR |
| | | |
| Pairwise Alpha (1 tailed) | | |

## Analysis Parameters

| | | | |
|---|---|---|---|
| Prior probability | 0.5 | | Cutscores |
| Cut ratio | 1 | Total NSR/NDI | 3 |
| CI alpha SR/DI (1 tailed) | 0.05 | Total SR/DI | -3 |
| CI alpha NSR/NDI (1 tailed) | 0.05 | | |
| Pairwise Alpha (1 tailed) | 0.01 | Subtotal SR/DI | -5 |
| Alpha - Test of Proportions | 0 | Adjusted prior | 0.5 |

## Summary of Analysis

Recorded physiological data were evaluated with the Empirical Scoring System (ESS-M). The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classifier with a multinomial reference distribution. Bayesian analysis treats the parameter of interest (i.e., deception or truth-telling) as a probability value for which the test data, together with the prior probability, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all  recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of truth-telling were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of truth-telling using the Clopper-Pearson method and a one-tailed alpha = .05. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred statistically from the test data.  A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

The categorical test result was parsed from the probabilistic result using two-stage rules. Two-stage rules are based on an assumption that the criterion variance of the test questions is non-independent, and make use of both the grand total and subtotal scores. The grand total score of 10 equaled or exceeded the required numerical cutscore (3). These data produced a Bayes factor of 12.8. The posterior odds of truth-telling was 12.8 to 1 for which the posterior probability was .93. The lower limit of the 1-alpha Bayesian credible interval was 5 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 95% that the posterior odds of truth exceed the prior odds. These analytic results support the conclusion that there were NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

### ESS Scores

| | | |
|---|---|---|
| **Chart 2** | | |
| | R4 | R6 |
| P1/P2 | 0 | 0 |
| | 0 | 0 |
| EDA | +2 | +2 |
| Cardio | 0 | +1 |
| PPG | 0 | 0 |

| | | |
|---|---|---|
| **Chart 3** | | |
| | R4 | R6 |
| P1/P2 | 0 | 0 |
| | 0 | 0 |
| EDA | -2 | +2 |
| Cardio | +1 | +1 |
| PPG | 0 | 0 |

| | | |
|---|---|---|
| **Chart 4** | | |
| | R4 | R6 |
| P1/P2 | 0 | 0 |
| | 0 | 0 |
| EDA | +2 | 0 |
| Cardio | +1 | 0 |
| PPG | 0 | 0 |

| | R4 | R6 |
|---|---|---|
| Subtotals | 4 | 6 |
| Grand Total | | 10 |

| | |
|---|---|
| Result | **No Significant Reactions** |
| Description | p-value: < 0.001 - Probability this result was produced by a deceptive person |
| Exam Type | Event Specific / Single Issue (Zone) |
| Scoring Method | OSS-3 Two-stage (Senter 2003) |
| Test of Proportions | 0.199 - No significant differences in artifact distribution |
| PF Name | 25-0209 HAIDER |
| Examinee | KHURSHEED HAIDER |
| Series Number | 1 |
| Report Date | Thursday, December 04, 2025 |

| Spot Scores | | | | | Decision Alpha (1 tailed) Cumulative normal distribution (Barland 1985) | Components | |
|---|---|---|---|---|---|---|---|
| ID | p-value | Result | Setting | Value | | Component | Weight |
| R4 | < 0.001 | | NSR | 0.050 | | Pneumo | 0.19 |
| R6 | < 0.001 | | SR | 0.050 | | EDA | 0.53 |
| | | | Bonferroni corrected alpha | 0.000 | | Cardio | 0.28 |
| | | | Test of Proportions (1 tailed) | 0.100 | | | |

| Relevant Questions | | |
|---|---|---|
| ID | Question Text | Question Answer |
| R4 | As an adult, have you ever had physical sexual contact with a minor? | No |
| R6 | As an adult, have you engaged in physical sexual contact with any minor? | No |

| Charts Scored | | |
|---|---|---|
| Chart | Date | Time |
| Chart 2 | 12/03/2025 | 2:28 PM |
| Chart 3 | 12/03/2025 | 2:33 PM |
| Chart 4 | 12/03/2025 | 2:38 PM |

| Measurements (Kircher & Raskin 1988) | | | | | | Standardized Lognormal Ratios | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Chart 2** | | | | | | **Chart 2** | | |
| | C3 | R4 | C5 | R6 | C7 | | R4 | R6 |
| P1 | 103 | 98 | 98 | 105 | 91 | P | 2.19 | 1.75 |
| P2 | 35 | 43 | 35 | 41 | 36 | EDA | 0.64 | 1.36 |
| EDA | 62 | 40 | 58 | 28 | 42 | Cardio | 2.04 | 3.00 |
| Cardio | 4 | 4 | 3 | 2 | 11 | WMean | 1.33 | 1.89 |
| | | | | | | | Mean: 1.61 | |

| **Chart 3** | | | | | | **Chart 3** | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | C3 | R4 | C5 | R6 | C7 | | R4 | R6 |
| P1 | 104 | 92 | 86 | 93 | 84 | P | 0.63 | 0.00 |
| P2 | 52 | 46 | 41 | 39 | 41 | EDA | -0.33 | 3.00 |
| EDA | 12 | 20 | 27 | 3 | 11 | Cardio | 0.61 | 3.00 |
| Cardio | 12 | 7 | 7 | 4 | 5 | WMean | 0.12 | 2.42 |
| | | | | | | | Mean: 1.27 | |

| **Chart 4** | | | | | | **Chart 4** | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | C3 | R4 | C5 | R6 | C7 | | R4 | R6 |
| P1 | 85 | 114 | 98 | 113 | 97 | P | 2.23 | 2.46 |
| P2 | 47 | 54 | 52 | 58 | 40 | EDA | 1.69 | 0.83 |
| EDA | 21 | 13 | 5 | 20 | 63 | Cardio | 3.00 | -3.00 |
| Cardio | A5 | 5 | 11 | 49 | 36 | WMean | 2.16 | 0.07 |
| | | | | | | | Mean: 1.12 | |

| Channel Contributions | | | | | | | | Results | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Component** | **Proportion** | **Area** | | **Chart** | **Proportion** | | **ID** | **Proportion** | **Weighted Mean** |
| Pneumo | 0.215 | 0.696 | | Chart 2 | 0.349 | | R4 | 0.488 | 1.20   1.46 |
| EDA | 0.52 | 0.583 | | Chart 3 | 0.331 | | R6 | 0.512 | **Grand Total Mean** |
| Cardio | 0.265 | 0.225 | | Chart 4 | 0.32 | | | | 1.33 |

| Advanced Options - OSS-3 | |
| --- | --- |
| **General Scoring Options** | |
| Delete all zero measurements | Yes |
| Zero threshold value | 1 |
| Allow a single CQ to score result (not for DLST) | No |
| Replace missing values with mean values | No |
| Check extreme contributions | No |
| Allow SR result when extreme contributions | Yes |
| **Alpha Values (one-tailed)** | |
| Kruskal-Wallis | 0.1 |
| Non-Significant Response (NSR) | 0.05 |
| Significant Response (SR) | 0.05 |
| **Test of Proportions** | |
| Test of Proportions alpha value (two-tailed) | 0.1 |
| Use Test of Proportions | Yes |
| Allow significant reaction result | Yes |
| Use all questions | No |
| Score neutral questions as control | Yes |
| **Event Specific / Single Issue (Zone)** | |
| Use Bonferroni | Yes |
| Use Kruskal-Wallis | No |
| Minimum number of usable RQs | 2 |

# Jeffrey Scott Lierly

**3800 Watt Avenue, Suite 212 - Sacramento, California  95821**

**(916) 710-1030   jlierlypolygraph@icloud.com**

## EXPERIENCE

| | |
|---|---|
| 01/2016 – present: | Polygraph Examiner – Mansfield, Lierly and Associates Credibility Assessment Professionals ○ Conduct polygraph examinations for law enforcement agencies, attorneys, probation departments, therapists, and private parties;  post-conviction sex offender testing (PCSOT) certified – 2500+ polygraph exams conducted |
| 05/2016 – present: | Converus Service Partner |
| | EyeDetect testing services and sales representative |
| 02-2024 – present: | Lafayette Instrument Company |
| | Polygraph equipment sales representative |
| 2013-2018: | Retired Annuitant/Background Investigator - California Department of Justice |
| | Conduct pre-employment background investigations |
| 1995-2012: | Special Agent/Special Agent Supervisor - California Department of Justice (LA and Redding offices) |
| | Conduct a wide variety of criminal investigations, intelligence, supervision - (honorably retired 2012) |
| 1983-1995: | Officer/Investigator - California Highway Patrol (Orange/San Diego/Riverside Counties) |
| | Patrol Officer, Felony Investigator, Multi-disciplinary Accident Team (MAIT) Investigator |

## EDUCATION

1986-1992:  Palomar Community College - San Marcos, CA - 30 Units, General Education

1981-1983:  Western Illinois University - Macomb, IL - 60 Units, Law Enforcement Administration

## SPECIALIZED POLYGRAPH/LAW ENFORCEMENT TRAINING

2015:  Basic Polygraph School, National Polygraph Academy (400 hours)

2015:  Post Conviction Sex Offender Testing (PCSOT), National Polygraph Academy 2018:

Advanced Polygraph Course, Peak Credibility Assessment (32 hours)

I have attended several annual/semi-annual training conferences hosted by the American Polygraph Association, American Association of Police Polygraphists, and California Association of Polygraph Examiners.  I have also attended several annual training conferences hosted by Converus.

Other law enforcement training to include: homicide/death investigation, officer involved shooting investigation, sex crimes, interview/ interrogation, dignitary security, intelligence, narcotics, informants, search warrants, and weapons/tactics.

## ACTIVE MEMBERSHIPS

American Polygraph Association

California Association of Polygraph Examiners (CAPE)

American Association of Police Polygraphists (AAPP)

## CERTIFICATIONS/LICENSURE

Certified Examiner #160 (CAPE)

Certified PCSOT Examiner (CAPE)

Certified Forensic Law Enforcement Polygraph Examiner #5064 (AAPP)

State of Oregon General Polygraph License #87808

EyeDetect Test Proctor, Test Administrator, Test Writer - Converus

## POLYGRAPH COMMITTEE ASSIGNMENTS

2018- 2021:  Membership Committee, American Polygraph Association

## OTHER EXPERIENCE

Including, but not limited to:  officer involved shooting instructor, range instructor, physical methods of arrest instructor, evidence officer, asset forfeiture coordinator, one of lead interrogators of suspect in murder of an off-duty police officer (2011), one of lead investigators in murder of an on-duty police officer (2002), deployed to Republican National Convention (1996), deployed to Los Angeles riots (1992) and federal police officer verdicts (1993), deployed to Olympic Games (1984)

## AWARDS

CA Attorney General's Health and Safety Award (officer involved shooting instructor - 2009)

DOJ Client Service Award (major fraud investigation - 2000)

John Goen Achievement Award – DOJ Sacramento Regional Office (1999)

Master Vehicle Theft recovery award (1990)

Mother's Against Drunk Driving Award (1986)

# MATTHEW SOULIER, MD

December 9, 2025

Mark Reichel, Esq
Attorney at Law
455 Capitol Mall, Suite 802
Sacramento, California 95814

RE: Khursheed Haider
Case No:  USA v Haider; 0972 2:23-CR-00299-01
Date of Birth: July 7, 1975

Dear Attorney Reichel:

At your request, I conducted a psychiatric evaluation of Khursheed Haider for the purpose of preparing a summary of his records, diagnosis, and a risk assessment to re-commit a sexual offense. I evaluated Dr. Haider on November 26, 2025.

On June 18, 2025, Dr. Haider pled guilty to one count of a two-count indictment: distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2). The offense occurred on October 30, 2023. On November 17, 2023, agents executed a federal search warrant on Dr. Haider's Roseville residence.  He was arrested and transported to the Sacramento County Main Jail. Dr. Haider said that he was apprehended two days after returning from Pakistan, where he was caring for his 90-year-old father's leg surgery. He was then transferred to the Taft Community Correctional Center. Dr. Haider briefly moved to the Colusa County Jail before returning to Taft. Dr. Haider will be sentenced on December 19, 2025.

**<u>INFORMED CONSENT</u>:**

Dr. Haider was advised of the non-confidential nature of the evaluation prior to beginning the interview. I informed him that I am not acting as his personal or treating psychiatrist. I explained that his attorney requested the evaluation and I would be submitting a report to his attorney documenting all of my medical findings. I told Dr. Haider that I was required to inform custody if he reported thoughts of harming self or others. I then asked Dr. Haider a series of questions to assess his understanding of the limits on confidentiality. Based on his responses, I surmised Dr. Haider understood the parameters of the evaluation and the limits on confidentiality.

1

**SOURCES OF INFORMATION**:

1. Interview with Dr. Haider on November 26, 2025 at the Taft Community Correctional Center;

2. Presentence Investigation Report, dated November 7, 2025;

3. United States' Reply in Support of Motion to Stay and Revoke Order Releasing Defendant, dated December 3, 2023;

4. Criminal Complaint, dated November 20, 2023;

5. Indictment, dated November 30, 2023;

6. Letters from Thomas Lopez and Rod Githens, dated October 14, 2025;

7. Forensic Examination Report, dated January 9, 2024;

8. Plea Agreement, dated June 18, 2025;

9. Federal Bureau of Investigation Entries, dated from November 8, 2023 to December 5, 2023;

10.    Statement to Respondent from the Medical Board of California, dated June 27, 2025;

11.    Letter from Dr. Haider to Judge Coggins, dated October 14, 2025;

12.    Letter to United States Probation, dated October 8, 2025.


**FORENSIC PSYCHIATRIC EXAMINATION:**

Identifying Data:

At the time of my interview, Dr. Haider was a 50-year-old (date of birth: July 7, 1975) man. Dr. Haider became a naturalized United States citizen on July 20, 2015. At the time of his arrest, he was living in a Roseville-owned home with his wife, Shahla Ambreen, and four children: Madiha (age 20), Warisha (age 16), Hazala (age 7), and Alishba (age 5). Hazala is diagnosed with autism spectrum disorder and attends a specialized school.

2

Dr. Haider said that he has been well-behaved throughout his entire incarceration. He was severely assaulted a couple of months ago by a Taft inmate. Dr. Haider explained, "People have different stressors in here. He hit me, and I just went to the guard." Dr. Haider lost vision in his right eye for a couple of months. He has since regained his full vision, and his assaulter has been moved.

Dr. Haider's wife and children remain in the Roseville home. They are all extremely supportive and enjoy regular video visits. However, they are not permitted to visit him. His wife will not tell him whether she has returned to work. She is teaching the Quran online. She was a trained physician in Pakistan, but she did not complete the required licensure and education in the United States. She chose to raise their children. Now that Dr. Haider is incarcerated, his wife has regretted not completing the necessary education. Dr. Haider believes she is attempting to work part-time, but she is unable to work full-time due to the children's needs. The family now receives food stamps. He is afraid to ask if their local Muslim community is financially supporting them. Dr. Haider stated, "I am too embarrassed to even ask."

Developmental History:

Dr. Haider was born on July 7, 1975 in Mansehra, Pakistan to his married parents, Haider Zaman and Syed Jan. His mother did not use alcohol or drugs during the pregnancy. Dr. Haider was born without any medical problems. He spoke early and met his other developmental milestones in a timely manner. Dr. Haider was the youngest of his five siblings. He was raised in a rural community. His mother was illiterate and uneducated, "… but loved us and took good care of us." Dr. Haider described his father as "loving, but strict." His father was controlling of his mother, but he did not recall him hitting her. Dr. Haider's father worked as a radio officer for the merchant Navy. His father was often away at sea for up to 6 months, while his mother remained in the village alone, tending a farm. Dr. Haider did not feel particularly close to his siblings until they were adults. He recalled that he avoided his oldest brother because he was very strict. In their father's absence, Dr. Haider's brother served as a father figure and frequently bullied him.

Dr. Haider has three older sisters and one younger brother, all of whom reside in Pakistan and London. His younger brother is a computer programmer in London. Dr. Haider's oldest brother is a retired Brigadier General in the Pakistani army. He lost his eyes during his service. Despite his blindness, his brother cares for their parents, who now live in Islamabad. They have since reconciled as adults. Dr. Haider said that his family was very proud of him for becoming a doctor and coming to the United States. His parents visited, but they did not like the United States because they missed Pakistan.

At age 4, Dr. Haider's father sought to provide the children with a better education and relocated to Karachi. His mother had never been outside of the village and did not speak the language of Karachi. Dr. Haider recalled that his parents frequently beat the children. He remembered his mother's hand being "so heavy." When his father returned home, he lined the children up and asked them general knowledge questions to assess their learning. Dr. Haider

3

perceived that he was asked the same questions as his older brothers. His father yelled at him, and Dr. Haider cried. His father made him do sit-ups. Dr. Haider's family mocked his "concave head" and he felt bullied by his uncles.

Dr. Haider said that a teacher beat him in elementary school for poor handwriting. The teacher hit him on his hand and head with a cane or ruler. The teacher left marks on his body, but his parents never seemed to notice. Dr. Haider also had a very brutal tutor at home who beat him and left bruises because he was a "slow learner." Dr. Haider was extremely afraid of the tutor and recalled urinating on the couch in front of him out of fear. He tried to tell his parents and siblings about the bruises, but they responded, "It is your fault." Dr. Haider's grandfather once visited the home, and Dr. Haider told him about the abuse. His grandfather told Dr. Haider, "I will take care of it," but instead gave the tutor his cane and instructed him to take care of Dr. Haider. He felt humiliated and belittled. The beatings continued through the eighth grade and only stopped after Dr. Haider began to blossom academically in high school.

Dr. Haider was first molested multiple times between the ages of 5 and 10 by a neighbor's older sister. He was again molested around age 5 by a painter at their family home. Dr. Haider stated, "He was on the third floor and my family was on the second. He grabbed my parts and he made me touch his privates." Lastly, around age 8, Dr. Haider sought fashion magazines at a bookstore. The owner noticed his interest in "glamorous" magazines, "… touched me and rubbed me." Dr. Haider said that it is difficult to recall all of what he experienced sexually as a child. He concluded, "It is very puzzling. Sometimes I liked it. Sometimes I felt disgusted. I was the youngest in my strict family." The family never discussed sexuality. Dr. Haider avoided telling his parents about his abusive experiences because "… they would have been shocked. They would've condemned me. They would've dismissed me and called me a liar or told me it was my fault… I wasn't even close to my dad and I didn't have enough strength to fight it off. My brother probably would've fought them."

Dr. Haider said that child sexual molestation was taken very seriously in Pakistan. He explained, "People would have gotten killed. It would escalate and lead to violence." However, he also clarified that his own childhood abuse would have been culturally "…taboo—a stigma to my family. Dishonorable. You can't tell the school. There is nobody to tell." Dr. Haider had intense guilt and shame about his abuse. He wet his bed until age 8. Dr. Haider had few friends and felt severely restricted and lonely.

As a teenager, Dr. Haider was more active in sports and formed friendships. He continued to remember his abuse shamefully, but he never disclosed it. Dr. Haider remained well-behaved throughout school. Teachers did not observe that he was hyperactive or inattentive. He was not aggressive. He was never suspended or expelled. Dr. Haider stated that he was not subjected to severe peer bullying.

Dr. Haider was first introduced to pornography at the bookstore at age 8. As a young teenager, he watched western pornographic heterosexual adult videos with a friend. The videos were difficult to obtain, but he reported that they enjoyed them at least 2 to 3 times per month.

After high school, Dr. Haider attended an American school ("like college to medical school")

4

in 1994. He obtained his first computer and discovered Internet pornography. Dr. Haider was extremely studious, and he began a habit of rewarding himself with 30 minutes of pornographic images after completing chapters of work. If he studied more intensely, he rewarded himself with more pornography. As the speed of the Internet increased in Pakistan, Dr. Haider was able to watch more detailed videos, which always involved adults.

In 2000, Dr. Haider completed a prestigious anesthesiology residency. He continued to escalate his Internet pornography use. He worked hard and rewarded himself with pornography for over two hours a day. Dr. Haider said that the pornography interrupted his sleep cycles, and he would have been a better student if he had not watched so much pornography.

Dr. Haider did not date or have any intimate relationships. In 2003, his mother arranged his marriage to his wife. He was immediately excited about the arrangement and found his wife very beautiful. In early 2005, Dr. Haider joined friends in the United States (Bronx) who were attempting to complete their medical education and obtain licensure. His wife gave birth to their first daughter in January 2005 in Pakistan. She was a medical student who then stopped her education to raise their children. Dr. Haider completed the medical licensing exams but initially did not match to a residency program in the United States.

Dr. Haider was later admitted to the Saint Barnabas Internal Medicine Residency Program. Away from his wife, Dr. Haider consumed even more pornography. His family joined him one year later, and they obtained an apartment. They had no other family, and his residency was highly stressful. His wife was extremely supportive, and he did well in his residency. Dr. Haider attempted to hide his pornography use from his wife, but she caught him a couple of times. She was shocked and angry and told him to stop. He temporarily stopped viewing pornography, but then quickly relapsed. He struggled to be intimate with his wife. She had come from a strict family, and his only sexual experience came from viewing pornography. Dr. Haider said that his wife felt overwhelmed, but they eventually found common intimate ground.

Dr. Haider loved being a father to his children. He described himself as an "integral part" of his family. He described his first daughter as his "best friend." He became a softball coach for his first two children after watching softball videos because his wife insisted on activities with modest uniforms. Dr. Haider also enjoyed helping his daughter's choreography during her participation in the Miss California pageant. He loved playing tennis and softball with his second child. They enjoyed blasting music and singing together in the car. He cried, stating, "I really dropped the ball on her. Because of me, she really struggles." Dr. Haider enjoyed swimming and soccer with his third autistic son. He recalled playing video games and sleeping with him. He said that his son still asks for him. Dr. Haider wondered if his last child, whom he described as "very intelligent," remembered him. Dr. Haider particularly misses family time. His actions have brought severe shame to him as "…everyone knows, the UK, Pakistan, friends from old residencies."

Dr. Haider spoke at length about each of his family members. He was particularly concerned about his wife. He stated, "She is under a lot of stress. We can't talk openly about this kind of situation. She feels that she could've done better. People have been pointing their fingers at her: What kind of wife are you? I don't know how she's holding up. We talk

every day, but we can't have open discussion. I need to talk to her face-to-face to see her expression." Dr. Haider regretted that their community had retreated from his children. They have felt isolated, and others will not come to their home. His younger children previously attended a charter school, but their mother was no longer able to drive them, and they transferred to a school closer to their home. Dr. Haider regretted that his second daughter had moved between three schools since his arrest. His older daughter had been accepted to a college with a guaranteed track to medical school, but she had to return to community college due to their limited finances.

Dr. Haider was a hospitalist in Worcester, Massachusetts from 2009 to 2011. The Haiders enjoyed the Muslim community and had their second daughter. Dr. Haider continued to experience stress from his professional demands. He used pornography to manage his anxiety. He routinely sought adult heterosexual pornography, but he also needed more sexually exciting videos to stimulate himself.

Dr. Haider completed a fellowship in critical care medicine from 2011 to 2013 in Pittsburgh. He always enjoyed caring for acutely ill patients. The fellowship was difficult, and he continued to relax by viewing adult heterosexual pornography.

Dr. Haider and his family wanted a more diverse community and moved to Roseville, California. Six months later, they purchased a home in which the family still resides. Dr. Haider continued to view pornography. After his wife caught him, the longest that he was able to go without viewing pornography was about 3-6 months. The more she suspected him, the more he had to view pornography at his work. A medical center employed him as a critical care intensivist. He served on their peer review committee. In early 2018, Dr. Haider joined V1 Health (telemedicine) as a vice president. He was an administrator and consultant. He continued to work long hours, 7 days a week, as an intensivist and virtually saw patients who needed critical care in multiple states from 2019 to 2020.

The pandemic was particularly challenging and stressful for Dr. Haider. His local ICU was constantly full with 24 patients, and his virtual visits in other states involved extremely sick patients, death, and difficult conversations with family members. He struggled to take care of himself and the patients. Dr. Haider was concerned about contracting COVID-19 and transmitting it to his family, particularly while they were in isolation. He was diagnosed with COVID, but he still had to take care of over 100 extremely ill patients who were often dying. He struggled to let family members in other states know that their loved ones had died. He found their grief stressful and unbearable. Dr. Haider continued to manage his anxiety with pornography. He became more interested in bondage adult heterosexual pornography. Dr. Haider said that the bondage gave him more adrenaline and stimulation because it was something new. He told himself, "I can handle it. I'm brave enough." He enjoyed viewing the bruises and analyzing whether they were real. He denied that he was looking for child pornography.

Dr. Haider was not able to introduce BDSM to his wife because she was too restrictive. Instead, he joined a bondage club in Oakland during the pandemic. He attended the club one to two times a year, but he did not participate in sexual activity. Dr. Haider enjoyed being a dominant and was excited by inflicting pain in a controlled environment.

6

During the pandemic, Dr. Haider also found Internet chat groups. He began chatting with people who posted videos and photos on the Free Sex Network (FSN). No child pornography was allowed on this group chat. He later moved to a Sessions application in about 2019. He had previously been exposed to child pornography, "… but this was the first time that I liked it." He made contact with people who had access to more child and bondage pornography. Dr. Haider never met any of these people or victims. He stated, "I thought we were just fantasizing and imagining. I didn't know I was causing any damage until my arrest… till then, I thought I had not done anything to anyone." Dr. Haider was required (as a form of verification) to share content to gain more content.

After the pandemic ended, Dr. Haider often cleaned out his computer of all pornography, deleted his email and contacts, and felt intense guilt and shame for a couple of months. He then relapsed with a new email seeking prior contacts. He used services such as Vickr, Wire, and Teleguard.

One month after Dr. Haider's arrest, he felt ready to talk to the prosecutor. He sought to provide information to dissuade the deviant community and protect victims. Dr. Haider insisted that he was still available to provide any information necessary to identify other individuals involved in similar activities.

Dr. Haider concluded, "We were not just looking. I caused harm. I'm the reason they are making this pornography. I created demand. Without an onlooker, they wouldn't make it." He appreciated that the production of child pornography harms children. Dr. Haider stated, "They are mentally and physically tortured, and it takes away their innocence. They can't tell anyone. I will feel the shame for the rest of my life."  He seemed surprised when I asked him if his child pornography consumption was related to his child abuse. Dr. Haider stated, "I don't know the answer." He continued, "I was not raised macho. I felt macho in these videos. I felt macho in medicine." Dr. Haider insisted, "I feel remorse. I know it won't happen again because I was causing harm to a child. I spent my life saving and helping others."


Academic History:

According to the Presentence Investigation Report, dated November 7, 2025: "Dr. Haider earned a high school diploma in 1992 from Government College for Men Nazimabad in Karachi, Pakistan.  He attended medical college at Hamdard University in Karachi from 1994 to 2000 and received his doctorate degree in medicine.  From 2000 to 2003, Haider was in a residency program for anesthesiology at Aga Khan University Hospital in Karachi.

Haider completed his United States medical examinations to qualify as a medical practitioner in 2003.  He did his medical residency from 2005 to 2008 at Saint Barnabas Hospital in Bronx, New York.  Haider practiced general medicine from 2008 to 2011 in Massachusetts and then a two-year fellowship in critical care at the University of Pittsburg Medical Center in Pennsylvania from 2011 to 2013…"

Dr. Haider was never suspended or expelled. He never received special education services.

Legal History:

Dr. Haider has never been arrested prior to the index offense. He was never arrested as a juvenile. Nobody has ever alleged inappropriate sexual behaviors until or after the index offense.


Dr. Haider's Account of the Index Offense:

See above.


Relationship/Sexual History:

Dr. Haider said that he is heterosexual and comfortable with his male gender. He married once and has four children.  Until the index offense, Dr. Haider had never been accused of any sexual misconduct. Dr. Haider denied that he has ever groomed or sought a sexual relationship with a live child. He stated that he has never been violent towards an intimate partner. Dr. Haider never sought escorts or prostitutes. He never paid for any form of sexual activity. Dr. Haider has not been sexually active since his arrest.


Substance Use History:

Dr. Haider has never tried illicit drugs or alcohol.


Interests/Current Coping:

Dr. Haider reported that he has always enjoyed highly stimulating activities. He jumped out of an airplane in 2017. He also enjoyed thrilling activities such as zip-lining and jet skiing. Dr. Haider said that he copes with his incarceration by exercising, reading, socializing with his peers, playing charades, and chess.

Dr. Haider has been more devoted to his Muslim faith since his arrest. He prays five times a day. He said that he has had more time to contemplate God and read scripture. He considers God his "final authority." His family had previously attended a Roseville mosque at least weekly for the last 10 years. That community and the imam remain important to him. Dr. Haider has reached out to the imam, pleading with him to discuss sex addiction within their community. He stated, "Everyone needs a discussion of this taboo topic. We don't mention sex or porn, and there are many Muslims who are addicted to porn. I ask him to please address this in the community." The imam has remained supportive of his family, "…but I feel too ashamed to speak with him." Dr. Haider lamented that there are only Christian religious services. He has asked for a Muslim service.

At the Taft Community Correctional Center, Dr. Haider completed online self-help courses from his tablet, but he lamented that there are few courses about treatment for sex addiction.

8

He has remained active by initiating groups with fellow inmates. Dr. Haider has attempted to practice BRACE: "Breathe deep. Take your time. Recall your priorities and what you would take away from your wife, kids, job, and religion. Call an accountability person if struggling. Talk to them and tell them you're having thoughts...Continuity with God. Pray. Count on God. Ask for help. Escape the environment."  He stopped reading 'Game of Throne's after 20 pages because of the "wrong content." He stopped watching reality shows about young women. He stated, "Those are triggers, and I know it will hurt me." Dr. Haider has avoided all pornography for over two years.

Dr. Haider was particularly proud of the Freedom Fight group, which is designed for sex and porn addicts. About 10 inmates take turns leading a discussion about sex addiction. Dr. Haider stated, "I didn't know how much harm this caused to all of us even as a physician… we discussed tools to address it… If I had seen this course before, I would have been different." Dr. Haider wrote to the national Freedom Fight group to inform them of their progress, and they commended his success. He also started a book group with five other men in which they discuss politics, addiction, climate change, and the nation. Lastly, Dr. Haider organized a "TED-like" talk in which participants discussed their backgrounds and what they had learned in life. He highlighted a recent talk in which an inmate taught them how to grow a large pumpkin, and another inmate discussed the embalming process after death. Dr. Haider was proud that the discussions improved the energy and caused them to appreciate that "…we look bad, but we have done great things."

Dr. Haider said that he tries to help others. He has not had any behavior problems, major writeups, or fights during his incarceration. Dr. Haider ultimately concluded, "I just have to be thankful that I was removed from that vicious circle of pornography."

Future Aspirations:

Dr. Haider still hopes that there is a remote possibility that he can practice medicine. Otherwise, he plans to become a paralegal and work for a medical law firm. He wants to return to his family and support them. Additionally, Dr. Haider intends to "…take up the banner of the taboo. Tell people to not do it. I will tell everyone to not watch pornography. You will hurt kids if you watch child pornography. I will tell the chat groups to stop. We are the reason for their business."

Psychiatric History:

Dr. Haider never saw a psychiatrist or therapist until his arrest. He saw a teledoctor in Taft because he felt intense guilt, shame, sadness, and passive suicidal thoughts. He was prescribed Lexapro, which has helped his anxiety and depression. He continued, "Looking back, I was very depressed after the pandemic. I felt worthless and not productive." Dr. Haider has never been hospitalized psychiatrically. He has never attempted suicide or engaged in self-injurious behaviors such as cutting.

Medical History:

9

After the pandemic, Dr. Haider required a neck surgery and he was unable to work for two months. He suffers from migraines, psoriatic arthritis, and hypertension. Dr. Haider has never suffered head trauma which resulted in loss of consciousness. He has never had a seizure. He is not allergic to any medicines.

Medications:

Lisinopren (40 mg, once daily),
Cardura (1 mg, once daily),
subcutaneous injections of Cimzia (400 mg, twice a month)
topical rash creams Clobetasol (0.05%, twice daily)
Calcipotriene (0.05%, twice daily).
Excedrin and Tylenol as needed for headaches
Lexapro (20 mg, once daily)
Trazodone (50 mg, once nightly).

Family Psychiatric, Legal, and Substance Use History:

Dr. Haider denied any psychiatric, suicide, legal, or substance use history.

Mental Status Examination:

Dr. Haider presented to the interview in a navy sweatshirt. He had a black linear mark on his forehead caused by friction from praying. He had a white beard and dark hair. He was extremely pleasant. Dr. Haider was cooperative. Dr. Haider appeared to be his stated age. He had no tattoos. He was talkative and easy to engage. Dr. Haider readily answered all of my questions in a forthright manner. Dr. Haider was attentive and made good eye contact. He was alert and respectful. Overall, he seemed to be of significantly above average intelligence. He was able to learn and retain information.

Dr. Haider's speech was of normal rate, and it was not pressured. Dr. Haider said that he has felt mostly melancholy during his incarceration. He often grew emotional and teary when discussing his family and sensitive topics. Dr. Haider said that he misses family, friends, and patients. He tries to recall old medical algorithms of care. He denied periods of excessively silly or giddy moods (manic episodes) during his incarceration. He said that he is now sleeping and eating well. He reported normal energy and concentration. Dr. Haider is not easily irritable or aggressive. Dr. Haider denied any recent suicidal or homicidal thoughts. Dr. Haider does not have debilitating anxiety, though these criminal charges have significantly stressed him. He is quite anxious about his sentencing. He denied ritualistic behavior consistent with obsessive-compulsive disorder.

Dr. Haider's flow of thought was logical and reality-based. There was no evidence for

10

psychosis. Dr. Haider denied the presence of auditory or visual hallucinations, and paranoia. However, he feels appropriately guarded of his surroundings. He did not believe the TV sent special messages, nor was he able to read minds, or be controlled telepathically by others.

Dr. Haider had insight into the seriousness of the charges. He demonstrated intense remorse and shame for his actions. He concluded, "I did bad things. I'm accountable. The hardest part is that my family is suffering because of me."

COGNITIVE ASSESSMENT:

Folstein Mini-Mental Status Examination (MMSE):

This is an instrument that consists of eleven questions that provide a gross quantitative assessment of an individual's cognitive status at the time of testing. There is a maximum score of 30, which indicates no gross abnormality is apparent in an individual's cognitive function.

Dr. Haider was oriented to the date and location of the interview.  Dr. Haider's concentration was tested by asking him to spell 'world' backwards, which he spelled: "DLORW." Dr. Haider recalled 3 of 3 objects after 3 minutes. His language abilities were normal. Dr. Haider's final score on the MMSE was 29/30 which is characteristic of normal gross cognitive function.

**STRUCTURED AND EMPIRICALLY-GUIDED ASSESSMENTS OF DR. HAIDER:**

***I assumed the offenses to be 100% true when I calculated Dr. Haider's risk according to the following summary of risk assessment instruments administered to him:

**STATIC-99R (Revised 2016):**

This instrument is designed to assist in the prediction of sexual and violent recidivism. The Static-99 consists of ten static (unchangeable) risk factors that have been shown in the literature to correlate with long-term risk of reconviction of sexual offenses in adult males. The instrument has demonstrated a moderate predictive accuracy. The possible scores range from -3 to 12. Scores between six and 12 are considered "well above average risk" for future sexual offending recidivism, 4-5 is considered "above average" risk, 1-3 is considered "average risk," -1 to 0 is considered "below average" risk, and -3 to -2 is considered "very low risk." According to the Static-99R manual: "Victims portrayed in child pornography are not scored as victims for the purposes of Static-99R. They do not count as unrelated, stranger, nor male victims. Only real, live, human victims count. If your offender is a child pornography maker and a real live child was used to create pornography by your offender or your offender was present when pornography was created with a real live child, this child should be scored as a victim on Static-99R victim questions (male, stranger, unrelated)."

Dr. Haider scored -1 for his age (aged 40-59.9). Dr. Haider scored +1 for any conviction (including the index or prior offense) of a non-contact sexual offense. In sum, Dr. Haider scored 0 on this instrument, indicating he has a "below average" risk of sexual offense recidivism.

### Minnesota Sex Offender Screening Tool-Revised (MnSOST-R):

The Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) is a 16-item, actuarial risk assessment tool initially developed for the Minnesota Department of Corrections (MDOC) to provide empirically based estimates of risk for sexual recidivism for incarcerated male sex offenders. According to the MnSOST manual, direct victims of sexual assault are scored. Dr. Haider received a total score of -7, placing him in the first (I) (score of <3) of three risk levels. Of the 16 risk factors, he gained only points for at least one victim was a stranger. This "low" risk level carries a 16% recidivism rate in 6 years.

### Hare Psychopathy Checklist (PCL-R):

The Psychopathy Checklist Revised (PCL-R; Hare) consists of 20 items. The items from the PCL-R are used in forensic settings to evaluate individuals for psychopathy, a personality disorder typified by interpersonal, affective, and antisocial traits. Each item is rated on a three-point scale. A total score of 30 or more is indicative of psychopathy. Dr. Haider scored 11. He does not meet the criteria for psychopathy or antisocial personality disorder.

## COLLATERAL SOURCE OF INFORMATION:

### According to the Presentence Investigation Report, dated June 17, 2025:

Institutional records from Colusa County Jail indicate the defendant received no incident reports while he was housed at their facility. Haider is currently housed at Taft Community Correctional Facility and a response from the institution noted no issues.

Haider said he was assaulted and temporarily lost his vision after he was punched in the eye during an unprovoked attack. Haider reported there are no counseling or meeting services for sex offenders while in jail. He said he started an informal support group called Freedom Fighter Group. He explained that inmates meet weekly, they have accountability partners, and they hold discussions and workshops on various topics with some biblical incorporation. Examples of topics discussed include coping skills, emotional triggers, self-analysis, and teaching breathing methods…

… The defendant confirmed his criminal conduct as stated in the factual basis of his plea. He stated he is ashamed that he hurt the victims, his family, his patients and the medical community, and members of his Muslim community. Haider stated he will give back to the community and correct his wrongs. He stated, "I know I'm bad. I

won't hide. I will show myself as a symbol that bad things hurt people and [I will] save many other people by educating others." Haider further stated, "I hope I am a positive impact to be an example not to do this conduct..."

…He said his viewing of pornography increased with the stress of providing supportive intensive care treatment as a doctor treating patients during the COVID 19 pandemic…

… He explained, "*I was not just an onlooker, I was making [the creation] of a community consumer market. I am the reason they are putting this stuff on the market. They do it because there are bad people like me. I was causing damage to these kids.*" Haider said he feels ashamed and distrust as people talk about him (due to the nature of his offense) and he likened it to his victims stating, "*I can imagine their pain and being scarred for life.*" He added that it is the first time he realized the time it will take to overcome the effects of their abuse and admits that he contributed to the problem…

## CURRENT DIAGNOSIS:

1. Unspecified Depressive Disorder

It is my opinion, with reasonable medical certainty, that Dr. Haider meets Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V) criteria for Unspecified Depressive Disorder. During and after the pandemic, Dr. Haider suffered from untreated depression, which may have met criteria for major depressive disorder. However, in the absence of an assessment at that time, there is insufficient information. Dr. Haider's mood more acutely deteriorated following his arrest, leading to limited evaluation and treatment with an antidepressant. His depressive symptoms are currently primarily in remission and likely more secondary to the stress associated with his incarceration.

## OPINION:

Dr. Haider was raised in a conservative and strict Muslim family in Pakistan. His parents were loving, but stern, if not abusive at times. Dr. Haider felt additionally bullied by his siblings, uncles, teachers, and a tutor. As a young man, he felt isolated, lonely, and incompetent. Dr. Haider suffered repeated acts of sexual abuse between the ages of 5-10. Men and a young woman molested him, but he did not have any avenue to report these experiences. He perceived that his family would blame him. He did not want to bring cultural shame to them by being a victim of such a taboo behavior.

Dr. Haider was also prematurely exposed to pornography as early as age 8. Though forbidden, he discovered pornographic videos with friends and escalated his pornography consumption as technology and the speed of the Internet advanced. By college, Dr. Haider developed a habit of soothing and rewarding his stress with pornography. His pornography use impaired his academic and occupational function. He daily consumed hours of pornography without any real intimate relationships until his marriage was arranged in 2003. Dr. Haider attempted to cease his pornography use when caught by his wife, but he was

never able to sustain remission for a significant period of time. He repeatedly relapsed whenever he felt overwhelmed by the demands of work.

As an adult, Dr. Haider continued to consume hours of adult pornography away from his wife, even at work, to soothe and stimulate himself. Dr. Haider was unquestionably addicted to pornography. He sometimes attempted to withdraw by deleting his collection, email, and contacts, but he repeatedly relapsed. During the pandemic, Dr. Haider experienced maximum professional stress as he struggled to care for 100's of severely ill and dying patients. It is not coincidental that while faced with feeling helpless and caring for dying patients and their families, he developed an interest in bondage and violent pornography. Trying to manage the pain of others led him to find sexual pleasure in the consensual infliction of pain upon an adult partner. Typical of sexual addicts, Dr. Haider was no longer able to be stimulated by prior pornography. He needed different forms and heightened stimulation to capture his attention and soothe his anxiety. Dr. Haider also later required neck surgery, which only led to greater opportunity for further pornography consumption.

During and following the pandemic, Dr. Haider sought increasing forms of pornography to satiate his need for stimulation. He joined chat groups that shared child pornography. He had to share content to gain access to further images. For the first time, he found himself sexually excited by child pornography. Dr. Haider rationalized his conduct at that time by asserting that he was only a consumer rather than an actual abuser of children.

Dr. Haider has since already corrected these false beliefs. He now appropriately appreciates that victims of child pornography are harmed physically and mentally. He also appreciates that there would not be victims of child pornography if there were not consumers like himself. Dr. Haider has initiated as much self-help for sexual addiction and deviant behaviors as he can muster within the Taft Correctional Center. I found his effort to be sincere and commendable. I did not observe a man who was trying to bolster a sentencing report. I was convinced that Dr. Haider is forthrightly attempting to heal himself and stop his deviant interests in children. All of this improvement also occurs independently, which he joyfully shares with others. I would expect that he would easily internalize and gain from any offered sexual offense therapy. He would be eager to learn more from a professional and improve.

In my medical opinion, Dr. Haider has excellent rehabilitative potential. He is an extremely intelligent and capable physician. He immigrated from Pakistan to the United States and managed to become an intensivist physician. The barriers for an internationally trained physician to practice in the United States are enormous. Dr. Haider is ashamed and regrets his criminal behaviors. As much as his crimes have been publicized, he remains committed almost evangelically to stopping others from engaging in these crimes. Dr. Haider is concerned about his Muslim community and the ongoing users of his prior sexual applications. He wants to contribute his knowledge and relationships to deter current or future consumers of child pornography.

On a cognitive level, Dr. Haider was able to rationalize and compartmentalize his use of pornography, but the essence of Dr. Haider is a compassionate caregiver, father, and husband. Dr. Haider was soft, gentle, committed to his religion, and demonstrated ample empathy. He was incredibly thoughtful towards his wife and children. He is intensely

worried about their well-being. He misses them and still aspires to care for them. He has a child with special needs. They remain committed to him and I anticipate that he will return to them. In my medical opinion, they would benefit from him returning to their family and community. He has the intelligence, commitment, and resources to improve his family and community. Dr. Haider has the potential to be a powerful and positive influence. I have no reservations recommending a high rehabilitative potential to the Court. He would be accepting of any offered sexual offense-specific therapy. In my medical opinion, Dr. Haider is highly likely to benefit from such therapy and any rehabilitative services offered.

Outside of the index offense, Dr. Haider has no significant legal history. Dr. Haider does not have a history of exploiting or conning others for personal gain. He does not meet criteria for antisocial personality disorder or psychopathy.

Dr. Haider is not blaming of others or even his circumstances for his criminal behavior. While I believe there is a potential connection to his early sexual abuse and addiction to pornography, he seemed confused by such a hypothesis. Dr. Haider made no excuses for his deviant behaviors. Dr. Haider demonstrated appropriate shame and remorse for his actions. Dr. Haider has been well-behaved while acknowledging his guilt during his incarceration.

Overall, in my medical opinion, Dr. Haider is a low risk to re-offend sexually. The following provides evidence to this point:

A.     Dr. Haider has no prior history of sexual offenses. The offenses enumerated in the indictment represent the first time that he has been accused of criminal sexual behavior. He has never been convicted or sentenced for a sexual offense until this instance.

B.     There have been no allegations of sexual misconduct since Dr. Haider's arrest. Dr. Haider has been determined to avoid even triggers for sexually deviant thoughts.

C.     Dr. Haider has no history of violence. The index offense does not include violent, non-sexual crimes.

D.     According to the STATIC and MNSOST-R, Dr. Haider's risk is elevated by the following two risk factors: a stranger victim and a conviction (index) for a non-contact sexual offense. His overall risk of future re-offense according to the STATIC is "below average," and "low" according to the MNSOST-R.

E.     Outside of the offenses, Dr. Haider's history lacks substantial deviance and diminishes his predisposition to commit a sexual offense. He has no history of delinquency, violence, or criminal activity.

F.     Dr. Haider has no juvenile delinquent record. Dr. Haider did not demonstrate early antisocial behaviors.

G.     There is not sufficient evidence of deviance for Dr. Haider to meet the criteria for antisocial personality disorder. Dr. Haider has minimal antisocial traits and does not meet the criteria for psychopathy.

H.     Dr. Haider forms secure attachments with others. He has been married since 2003 to a wife who remains supportive. He has 4 children.

I.     Sexual offenders tend to recidivate less with age. Dr. Haider is less than a decade from reaching the lowest-risk age bracket.

J.     Dr. Haider appreciated the harm he caused to the victims. He was extremely remorseful and ashamed.

This opinion is based on the information provided to me as noted in the sources of information outlined above. I reserve the right to amend my opinion as necessary should further information become available.

If I can be any further assistance, please call 530-313-0953.

Respectfully submitted,

Matthew Soulier, MD
Board Certified in Adult, Child and Adolescent Forensic Psychiatry

16

# Matthew F. Soulier, M.D.

4258 Rimini Way
El Dorado Hills, CA 95762
**Phone:  (530) 313-0953**
**mfsoulier@gmail.com**

### PART I: General Information

**Place of Birth:**

Richmond, VA

**Education:**

| | |
|---|---|
| 1998 | University of Utah, B.S. Chemistry |
| 2002 | University of Utah School of Medicine, M.D. |

**Postdoctoral Training:**

| | |
|---|---|
| 2002 – 2005 | Resident, Psychiatry, Duke Medical Center, Duke Medical School |
| 2005 – 2007 | Resident, Child and Adolescent Psychiatry, Massachusetts General and McLean Hospitals, Harvard Medical School |
| 2007 – 2008 | Fellow, Forensic Psychiatry, Massachusetts General Hospital, Harvard Medical School |

**Licensure and Certification:**

| | |
|---|---|
| 2005 – 2007 | Full Medical License, North Carolina, Registration #200500260 |
| 2005 – 2009 | Full Medical License, Massachusetts, Registration #224157 |
| 2007 | Diplomate, American Board of Psychiatry and Neurology (Psychiatry), Certificate #57404 (Recertified in 2017) |
| 2008 | Diplomate, American Board of Psychiatry and Neurology (Subspecialty of Child and Adolescent Psychiatry), Certificate #6627 (Recertified in 2017) |
| 2008 – | Full Medical License, California, Registration #A105316 |

| | |
|---|---|
| 2013 | Diplomate, American Board of Psychiatry and Neurology (Subspecialty of Forensic Psychiatry), Certificate #2103 |
| 2021 – | Full Medical License, Utah, Registration #12048572-1205 |
| 2021 – | Utah Department of Human Services Designated Examiner |

**Academic Appointments:**

| | |
|---|---|
| 2002 – 2005 | Clinical Fellow in Psychiatry, Duke Medical School |
| 2005 – 2008 | Clinical Fellow in Psychiatry, Harvard Medical School |
| 2008 – 2014 | Assistant Clinical Professor of Psychiatry, University of California, Davis Medical School |
| 2011 | Instructor of Record, Doctoring Two, University of California, Davis Medical School |
| 2011 – 2017 | Child Psychiatry Residency Training Director, University of California, Davis Medical School, Department of Psychiatry and Behavioral Sciences |
| 2013 – 2014 | Instructor of Record, Doctoring Three, University of California, Davis Medical School |
| 2014 – 2017 | Associate Clinical Professor of Psychiatry, University of California, Davis Medical School |
| 2014 – 2016 | Adult Psychiatry Residency Associate Training Director, University of California, Davis Medical School, Department of Psychiatry and Behavioral Sciences |

**Hospital Appointments:**

| | |
|---|---|
| 2002 – 2005 | Resident in Psychiatry, Duke Medical Center |
| 2005 – 2007 | Resident in Child and Adolescent Psychiatry, Massachusetts General and McLean Hospitals |
| 2005 – 2008 | Consulting Psychiatrist, Tewksbury State Hospital |
| 2005 – 2008 | Consulting Psychiatrist, Newton Wellesley Hospital |

2005 – 2008    Consulting Psychiatrist, Erich Lindemann Mental Health Center

2006 – 2008    Consulting Psychiatrist, Mount Auburn Hospital

2006            Chief Resident, Child and Adolescent Psychiatry, Massachusetts
                General and McLean Hospitals

2007 – 2008    Clinical Fellow, Massachusetts General Hospital

2008 – 2014    Assistant Clinical Professor of Psychiatry, University of California,
                Davis Medical School

2014 – 2017    Associate Clinical Professor of Psychiatry, University of California, Davis
                Medical School

**Court Appointments:**

2008 –         County of Sacramento Court-Appointed Criminal Expert Panel

2008 –         County of Sacramento Court-Appointed Juvenile Delinquency
                and Dependency Expert Panel

2010 –         Placer County Superior Court Appointed Expert: Criminal, Juvenile,
                and Family Law

**Hospital and Health Care Organization Service Responsibilities:**

2005 – 2008    Consulting Psychiatrist, Polaris Healthcare Services, Tewksbury
                State Hospital

2005 – 2008    Consulting Psychiatrist, On-Site Psychiatric Services, Newton
                Wellesley Hospital

2005 – 2008    Consulting Psychiatrist, On-Site Psychiatric Services, Erich
                Lindemann Mental Health Center

2006 – 2008    Consulting Psychiatrist, On-Site Psychiatric Services, Mount Auburn
                Hospital

**Other Committee Assignments:**

1996 – 1997    Chair, University of Utah Academic Affairs Board

1996 – 1997    Academic Senate, University of Utah

1997 – 1998    Chair, University of Utah Student Assembly

| | |
|---|---|
| 1997 – 1998 | Joint Apportionment Board, University of Utah |
| 1997 – 1998 | Olympics Committee, University of Utah |
| 1998 – 1999 | Coalition for Utah's Future. Neighborhood Project Leader |
| 2009 – 2010 | UC Davis Children's Hospital Clinical Quality Improvement Multidisciplinary Programmatic Subcommittee |
| 2010 – 2011 | UC Davis Medical School Doctoring Steering Committee |
| 2010 – 2011 | UC Davis Medical School Transition to Clerkship Committee |
| 2011 – | UC Davis Department of Psychiatry Adult Residency Teaching Education Committee |
| 2011 – | UC Davis Department of Psychiatry Child Residency Teaching Education Committee |
| 2011 – 2017 | UC Davis Medical Center Institutional Review Board for Human Research |

**Professional Societies:**

| | |
|---|---|
| 1998 – 2005 | American Medical Association, Student Member |
| 2005 – | American Academy of Child and Adolescent Psychiatry |
| 2008 – | Central California Regional Organization of Child and Adolescent Psychiatry |
| 2008 – 2015 | American Academy of Psychiatry and the Law |
| 2011 – | American Association of Directors of Psychiatric Residency Training |
| 2011 – | Association of Family and Conciliation Courts |
| 2016 – | California Medical Association |
| 2016 – | Sierra Sacramento Valley Medical Society |

**Reviewer:**

| | |
|---|---|
| 2012 – | Frontiers in Forensic Psychiatry |
| 2013 – | Journal of the American Academy of Child and Adolescent Psychiatry |

2014 –        Harvard Review of Psychiatry

**Awards and Honors:**

1991        Eagle Scout

1997        Elected Vice President of the University of Utah Student Body

1998        Phi Beta Kappa

1998        Outstanding Senior Chemistry Student Award

2000        Western Student Medical Research Forum Subspecialty Award

2009        American Academy of Psychiatry and the Law Young Investigator Award

2016        Employee Excellence Award


**PART II: Research, Teaching, and Clinical Contributions**

**Narrative Report:**

Psychiatry Resident at Duke Medical Center from July 2002 until June 2005.

Child and Adolescent Psychiatry Resident at Massachusetts General and McLean Hospitals, Harvard Medical School, from July 2005 until June 2007.

Chief Resident in Child and Adolescent Psychiatry at Massachusetts General and McLean Hospitals, Harvard Medical School, from July 2006 until November 2006.

Forensic Fellow at Massachusetts General Hospital, Harvard Medical School, from July 2007 until June 2008.

Assistant Clinical Professor of Psychiatry, UC Davis Medical Center, from August 2008 to 2014.

Child Psychiatry Residency Training Director, UC Davis Medical School, Department of Psychiatry and Behavioral Sciences, from 2011 to 2017.

Associate Clinical Professor of Psychiatry, UC Davis Medical Center, from 2014 to present.

Adult Psychiatry Residency Associate Training Director, UC Davis Medical School, Department of Psychiatry and Behavioral Sciences, from 2014 to 2016.

Adult, Child, and Adolescent Clinical Psychiatrist, Elevation Physicians, Folsom, California, from 2018 to 2020.

Staff Psychiatrist, Mule Creek State Prison, CDCR, from 2020-2021.

Psychiatrist, Strive Psychiatry, Draper, Utah, from 2021-2023.

Senior Supervising Psychiatrist, Mule Creek State Prison, CDCR, from 2023 to present.


**Research:**

1996 –1997    Research Assistant, University of Utah (Salt Lake City, UT): The Genetics of Neuroblastoma and Medulloblastoma. Performed basic molecular techniques for projects in the lab. Principal Investigator: Dr. William Carroll

1999 –2000    Research Assistant, University of Utah (Salt Lake City, UT): Expression of eNOS, iNOS, nNOS, mRNA and Protein in Lungs of Subjects who Died with Acute Respiratory Distress Syndrome. Performed advanced molecular techniques, and laser microdissection to measure the expression of nitric oxide synthetases in ARDS and healthy lungs. Principal Investigator: Dr. Kurt Albertine

2001    Research Assistant, University of Utah (Salt Lake City, UT): The Genetics of Nicotine Addiction. Performed a pilot study and generated written reports that were subsequently incorporated into a $10.7 Million multi- disciplinary project grant approved 01/03. Principal Investigator: Dr. William McMahon

2005    Research Assistant, Duke Medical Center (Durham, NC): Cognitive Behavioral Therapy for Children with Obsessive Compulsive Disorder. Participated in CBT treatment of children with OCD, with regular neuroimaging to monitor their response. Principal Investigator: Dr. Phoebe Moore

2008    Research Assistant, Massachusetts General Hospital, Harvard Medical School (Boston, MA): Current Status of the Duty to Protect. Analyzed 70 *Tarasoff* related cases from a Westlaw based search between 1985 and 2006. Principal Investigator: Dr. James Beck

2013            Research Assistant, ADHD Lab, MIND Institute, UC Davis Medical
                School (Sacramento, CA). Principal Investigator: Dr. Julie Schweitzer

2016 –2017      Discipline Director, Child Psychiatry, Leadership and Education in
                Neurodevelopmental Disorder, UC Davis Medical School (Sacramento,
                CA). Principal Investigator: Dr. Sally Rogers


**Teaching: Local Contributions and Presentations:**

2006            Lecture, Harvard Psychiatry Residency Seminar,
                McLean Hospital, Understanding Custody Issues

2006            Lecture, Massachusetts General Hospital Pediatric Residency
                Program, The Risks of SSRIs

2007            Lecture, Massachusetts General Hospital Law and
                Psychiatry, Civil Commitment of Minors and Adults

2008            Lecture, Massachusetts General Hospital Law and Psychiatry, Custody
                and Termination of Parental Rights

2008            Lecture, Massachusetts General Hospital Children and the
                Law, Substance Abuse and Pregnancy

2008-2017       Course Director, UC Davis Child Psychiatry Residency, Topics in Child
                and Adolescent Forensic Psychiatry (Child Abuse, Child Eyewitness
                Testimony, Juvenile Violence, Sexual Offenses)

2008-2011       Instructor, UC Davis Medical School, Doctoring for Second Year
                Medical Students

2009            Panel Discussion, UC Davis Child and Adolescent Psychiatry, Ethics in
                Child Psychiatry—Paternalism and Certainty

2009-2015       Lecture, UC Davis Psychiatry and the Law,
                Developmental Disability

2009-2014       Lecture, UC Davis Psychiatry and the Law, Child Abuse

2009-2014       Lecture, UC Davis Psychiatry and the Law, Child Eyewitness Testimony
                and Memory

2009-2014       Lecture, UC Davis Psychiatry and the Law, Child's Rights

2009-2014       Lecture, UC Davis Adult Psychiatry Residency, Evidence-Based
                Child Forensic Psychiatry

| 2009-2017 | Co-Course Director, UC Davis Child Psychiatry Residency, Introduction to Child Psychiatry |
|---|---|
| 2009 | Lecture, UC Davis Child Abuse Conference, Use of Medications for Abused Children |
| 2009-2014 | Lecture, UC Davis Psychiatry and the Law, Juvenile Law |
| 2010-2013 | Lecture, UC Davis Psychiatry and the Law, Juvenile Adjudicative Competency |
| 2010-2017 | Lecture, UC Davis Psychiatry, Juvenile Violence and Behavior Disorders |
| 2011 | Lecture, UC Davis Psychiatry, Post Traumatic Stress Disorder |
| 2011 | Course Director, UC Davis Medical School, Doctoring for Second Year Medical Students |
| 2013-2014 | Instructor, UC Davis Medical School, Doctoring for Third Year Medical Students |
| 2013-2017 | Lecture, UC Davis Psychology Postdoctoral Fellowship, Custody and High Conflict Divorce |
| 2020-2021 | Lecture, University of Utah Child and Adolescent Psychiatry, Child Forensic Psychiatry |

**Teaching: National Contributions:**

| 2000 | Presenter, Western Student Medical Research Forum (Carmel, CA): Expression of eNOS, iNOS, nNOS, mRNA and Protein in Lungs of Subjects who Died with Acute Respiratory Distress Syndrome |
|---|---|
| 2009 | Presenter, American Academy of Psychiatry and the Law (Baltimore, MD): Current Status of the Duty to Protect |
| 2009 | Presenter, US Army (Savannah, Georgia): Post Traumatic Stress Disorder and Rape Trauma Syndrome |
| 2010 | Lecture, Child and Adolescent Bipolar Disorder (Oakland, CA): Special Education Hearing Officers and Mediator Training |
| 2010 | Presenter, American Academy of Psychiatry and the Law (Tucson, |

AZ):  Juvenile Malingering: How do we assess children who lie?

2011        Presenter, American Psychiatric Association (Honolulu, HI): APA Board Review Course. Child Psychiatry

2011        Presenter, Indian Health Services National Medical Providers' Best Practices and GPRA Measures Conference (Sacramento, CA): Telemedicine

2011        Presenter, California District Attorneys Association (Sacramento, CA):  Juvenile Adjudicative Competency

2012        Presenter, American Academy of Child and Adolescent Psychiatry (San Francisco, CA): Juvenile Adjudicative Competency

2013        Presenter, California District Attorneys Association (Sacramento, CA):  Assessment of Sexual Offenders

2013        Presenter, American Academy of Child and Adolescent Psychiatry (Orlando, FL): Juvenile Offenders: Legal Trends, the Los Angeles County Juvenile Mental Health Court, and the Prevention of Violence

2014        Presenter, California District Attorneys Association (Sacramento, CA):  Victims of Human Trafficking

2015        Presenter, American Academy of Child and Adolescent Psychiatry (San Francisco, CA): Sleep and Sleep Disorders

2015        Presenter, California District Attorneys Association (Sacramento, CA):  Youth Hate Crimes

2015        Presenter, Judicial Proceedings Panel (Washington, DC): The Role of Retaliation in Military Sexual Assault Crimes

2015        Presenter, American Academy of Child and Adolescent Psychiatry (San Antonio, TX): The Role of Suggestibility in Child Sexual Abuse Investigation and Prosecution

2016        Presenter, California District Attorneys Association (Sacramento, CA):  Hypnosis and Eyewitness Testimony

2016        Presenter, California Psychiatric Association (Palm Springs, CA): Violence Risk Assessment in Youth

2016        Presenter, American Academy of Child and Adolescent Psychiatry (New York City, NY): Evaluation and Violence Risk Assessment in Early Psychosis

2016        Presenter, American Academy of Child and Adolescent Psychiatry

(New York City, NY): Group Homes and the Media

| 2020 | Presenter, US Army Trial Advocacy for Prosecutors (San Antonio): Sentencing in Child Sexual Abuse |

2020        Presenter, US Army Trial Advocacy for Prosecutors (San Antonio):
            Sentencing in Child Sexual Abuse

2021        Presenter, US Army Defense Counsel Assistance Program (Dallas):
            False Confession

2022        Presenter, US Navy Trial Advocacy for Prosecutors (Newport):
            Mental Health Diagnoses in Child Victims

2022        Presenter, US Army Trial Advocacy for Prosecutors (San Diego):
            Mental Health Diagnoses in Child Victims

2024        Presenter, University of Utah Grand Rounds (Salt Lake City):
            Transfer of Juveniles

## PART III: Bibliography

**Original Articles:**

1. Albertine KH, **Soulier MF**, Wang Z, Ishizaka A, Hashimoto S, Zimmerman GA, Matthay MA, Ware LB. Fas and fas ligand are up-regulated in pulmonary edema fluid and lung tissue of patients with acute lung injury and the acute respiratory distress syndrome. Am J Pathol. 2002; 161(5):1783-96.

2. **Soulier MF**, Maislen A, Beck JC. Status of the Psychiatric Duty to Protect, Circa 2006. J Am Acad Psychiatry Law. 2010; 38(4):457-473.

3. **Soulier, MF**, Scott CL. Juveniles in Court. Harvard Review of Psychiatry. Nov 2010; 18(6): 317–325.

4. **Soulier, MF.** Juvenile Offenders: Competence to Stand Trial. Psychiatric Clinics of North America. Dec 2012; 35(4): 837-854.

5. Bhe, E., Summers, S., Pakyurek, M., **Soulier, M**., & Ferranti, J. (2014). Outpatient Psychiatric Documentation Use by Primary Care Physicians Following De-Sensitization in the Electronic Medical Record. Academic Psychiatry, 1-6.

6. **Soulier, MF**, McBride, AB. Mental Health Screening and Assessment of Detained Youth.  Psychiatric Clinics of North America: Adjudicated Youth. Jan 2016; 25(1): 27-39.

**Book Chapters:**

1. Brendel RW, **Soulier MF**: Legal issues, addiction, and gender. In: Brady L, Back S, Greenfield S, editors. Women and Addiction. A Comprehensive Textbook. New York, NY: Guilford Press, 2009.

2. **Soulier MF**. Ethics of Child and Adolescent Forensic Psychiatry. In Benedek EP, Ash P, Scott CL, editors. Principles and Practice of Child and Adolescent Forensic Mental Health. Washington DC: American Psychiatric Publishing, Inc, 2009.

3. Scott CL, **Soulier MF**. Juveniles and Criminal Responsibility Evaluations. In Grigorenko, E.L. editor. Handbook of Juvenile Forensic Psychology and Psychiatry. Springer Science+Business Media, LLC, 2012.

4. **Soulier, MF**, Ayoub C. Evaluation of Child Abuse and Neglect. In Schouten, R, editor. Primer on Mental Health Practice and the Law. New York, NY: Oxford University Press, 2017.

5. **Soulier, MF**, McBride, AB. Children in Need of Services (CHINS).  In Schreck, CJ. editor. Encyclopedia of Juvenile Delinquency and Justice: Hoboken, NJ: John Wiley and Sons, 2017.